# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
May 28, 2014 Session Heard at Cookeville[1]

## EDWARD THOMAS KENDRICK, III v. STATE OF TENNESSEE

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Hamilton County**
**No. 220622     Don W. Poole, Judge**

**No. E2011-02367-SC-R11-PC - Filed January 16, 2015**

This post-conviction appeal involves ineffective assistance of counsel claims made by a prisoner who fatally shot his wife. A Hamilton County jury, rejecting the prisoner's defense that his rifle had malfunctioned and fired accidentally, convicted him of first degree premeditated murder. The Court of Criminal Appeals affirmed his conviction on direct appeal. *State v. Kendricks*, 947 S.W.2d 875 (Tenn. Crim. App. 1996). The prisoner later filed a petition for post-conviction relief in the Criminal Court for Hamilton County alleging, among other things, that his trial counsel had been ineffective because he decided not to seek an expert to rebut the anticipated testimony of the prosecution's expert and because he did not attempt to use an exception to the hearsay rule to introduce statements favorable to the prisoner. The post-conviction court conducted a hearing and denied the petition. The Court of Criminal Appeals reversed the post-conviction court and granted the prisoner a new trial after concluding that trial counsel's representation had been deficient and that, but for these deficiencies, the jury might have convicted the prisoner of a lesser degree of homicide. *Kendrick v. State*, No. E2011-02367-CCA-R3-PC, 2013 WL 3306655 (Tenn. Crim. App. June 27, 2013). We granted the State's application for permission to appeal. Trial counsel's decisions not to consult an expert to rebut the anticipated testimony of a prosecution expert and not to attempt to introduce a potentially favorable hearsay statement did not amount to deficient performance that fell below the standard of reasonableness. Accordingly, we reverse the decision of the Court of Criminal Appeals and remand for consideration of the prisoner's remaining claims.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Reversed; Case Remanded**

---

[1]Oral argument was heard in this case on May 28, 2014, at Tennessee Technological University in Cookeville, Putnam County, Tennessee, as part of this Court's S.C.A.L.E.S. (Supreme Court Advancing Legal Education for Students) project.

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., JANICE M. HOLDER, CORNELIA A. CLARK, and GARY R. WADE, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Gordon W. Smith, Associate Solicitor General; John H. Bledsoe, Senior Counsel; Bill Cox, District Attorney General; and Lance Pope, Assistant District Attorney General, for the appellant, State of Tennessee.

Edward T. Kendrick, III, Pro Se, and Ann C. Short, Knoxville, Tennessee, for the appellee, Edward Thomas Kendrick, III.

Stephen Ross Johnson and W. Thomas Dillard, Knoxville, Tennessee, for the Amici Curiae National Association of Criminal Defense Lawyers and Tennessee Association of Criminal Defense Lawyers.

**OPINION**

**I.**

Edward T. Kendrick, III and Lisa Kendrick were married and had two children, a three-year-old son and a four-year-old daughter. Their marriage had failed, but they were continuing to live together while they pursued an irreconcilable differences divorce. Mr. Kendrick was angry because he suspected that Ms. Kendrick was having an affair.

Ms. Kendrick worked at a gas station in Chattanooga. At approximately 10:00 p.m. on March 6, 1994, Mr. Kendrick drove the couple's station wagon to the gas station. Their two children were in car seats in the station wagon's rear seat. On the floorboard of the front passenger seat was a loaded Remington Model 7400 .30-06 caliber hunting rifle.

Mr. Kendrick entered the gas station and asked Ms. Kendrick to come out to the car because he had something to show her. When she finished waiting on another customer, Ms. Kendrick followed Mr. Kendrick to the automobile. As Ms. Kendrick approached the automobile, Mr. Kendrick opened the back passenger door and spoke briefly to the children. Then, he opened the front passenger door, picked up the loaded rifle from the floorboard, and walked to the back of the automobile carrying the rifle.

The rifle fired, and a single bullet struck Ms. Kendrick in the chest. She fell backward onto the pavement and died almost instantly. Mr. Kendrick stated later that he stood over Ms. Kendrick's body for a few seconds, looking into her eyes as she died. Then, he got back into the automobile and drove toward the airport.

A bystander followed Mr. Kendrick. At some point during the relatively short drive to the airport, Mr. Kendrick threw his rifle out of the window of the moving automobile. Upon arriving at the airport, Mr. Kendrick used his cellular telephone to call 9-1-1. He told the operator that he had shot his wife. During the same time frame, the bystander who had followed Mr. Kendrick to the airport told a police officer standing outside the airport what had happened at the gas station. Mr. Kendrick was taken into custody.

Early the following morning, Steve Miller, a crime scene investigator, found Mr. Kendrick's rifle on the side of the road. He placed the rifle in the trunk of his automobile and drove to the police station. The rifle fired while Sergeant Miller[2] was removing it from the trunk of his automobile, striking his left foot.

In November 1994, Mr. Kendrick was tried for the murder of his wife in the Criminal Court for Hamilton County. The State presented twelve witnesses, including Sergeant Miller, the Kendricks' four-year-old daughter, and an expert firearms examiner. Mr. Kendrick presented four witnesses and testified on his own behalf. The State called one rebuttal witness. The jury convicted Mr. Kendrick of premeditated first degree murder, which carried an automatic life sentence. On direct appeal, the Court of Criminal Appeals upheld the conviction. *State v. Kendricks*,[3] 947 S.W.2d 875 (Tenn. Crim. App. 1996), *perm. app. denied* (Tenn. 1997).

Mr. Kendrick filed a petition for post-conviction relief in April 1998. The post-conviction court dismissed the petition after deciding that the issues it raised were either waived or previously determined. However, after finding that Mr. Kendrick's ineffective assistance of counsel claims had not been waived, the Court of Criminal Appeals reversed the post-conviction court and remanded the case for further proceedings. *Kendricks v. State*, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999) (No Tenn. R. App. P. 11 application filed).

In March 2000, Mr. Kendrick, aided by counsel, filed an amended petition for post-conviction relief. At a series of hearings in February and March 2011 – almost sixteen years after his original trial – Mr. Kendrick raised forty-three claims of ineffective assistance of trial counsel, twenty-two claims of ineffective assistance of appellate counsel on direct appeal, and twelve claims of prosecutorial misconduct. He supported these claims with a 631-page memorandum of law.

---

[2]We will refer to this officer as "Sergeant Miller" because that was his title at the time of the post-conviction hearings.

[3] Several of the early documents in this case misspelled Mr. Kendrick's name as "Kendricks."

The post-conviction court declined to grant Mr. Kendrick relief in an order filed on October 13, 2011. On appeal, the Court of Criminal Appeals reversed the post-conviction court's dismissal of Mr. Kendrick's petition but limited its decision to only two of the forty-three claims of ineffective assistance of trial counsel. The appellate court determined that trial counsel's performance had fallen below an objective standard of reasonableness when counsel failed to obtain expert evidence to rebut Mr. Fite's testimony that Mr. Kendrick's rifle could only be fired by pulling the trigger and when counsel failed to attempt to introduce hearsay evidence regarding Sergeant Miller's initial explanation about how he came to be shot by Mr. Kendrick's rifle. *Kendrick v. State*, No. E2011-02367-CCA-R3-PC, 2013 WL 3306655, at *13-14 (Tenn. Crim. App. June 27, 2013). The appellate court also determined that these errors prejudiced Mr. Kendrick because had it heard such evidence, "it is reasonably likely the jury would have accredited the Petitioner's version of events and convicted him of a lesser degree of homicide." *Kendrick v. State*, 2013 WL 3306655, at *17. Based on these conclusions, the Court of Criminal Appeals pretermitted its consideration of Mr. Kendrick's remaining claims. *Kendrick v. State*, 2013 WL 3306655, at *18.

## II.

This claim has been brought under Tennessee's Post-Conviction Procedure Act.[4] The Act directs Tennessee's courts to grant post-conviction relief to a person "in custody" whose "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. §§ 40-30-102, -103. The prisoner seeking post-conviction relief bears "the burden of proving the allegations of fact by clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2012); *see also* Tenn. Sup. Ct. R. 28, § 8(D)(1); *Nesbit v. State*, ___ S.W.3d ___, ___, 2014 WL 5901964, at *2 (Tenn. 2014).

Appellate courts review a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness. *Nesbit v. State*, 2014 WL 5901964, at *1; *Whitehead v. State*, 402 S.W.3d 615, 621 (Tenn. 2013). However, appellate courts are bound by the post-conviction court's underlying findings of fact unless the evidence preponderates against them. *Arroyo v. State*, 434 S.W.3d 555, 559 (Tenn. 2014); *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009). Accordingly, appellate courts are not free to re-weigh or re-evaluate the evidence, nor are they free to substitute their own inferences for those drawn by the post-conviction court. *State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). Appellate courts must generally defer to a post-conviction court's findings concerning

---

[4]The Tennessee Post-Conviction Procedure Act is presently codified at Tenn. Code Ann. §§ 40-30-101 to -122 (2012 & Supp. 2014).

witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence. *Whitehead v. State*, 402 S.W.3d at 621; *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999).

Mr. Kendrick's substantive allegation is that he was denied his constitutional right to effective assistance of counsel. Article I, Section 9 of the Constitution of Tennessee establishes that every criminal defendant has "the right to be heard by himself and his counsel." Likewise, the Sixth Amendment to the United States Constitution guarantees that all criminal defendants "shall enjoy the right . . . to have the [a]ssistance of [c]ounsel." These constitutional provisions have been interpreted to guarantee a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975).

To prevail on a claim of ineffective assistance of counsel, a petitioner must prove both that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. at 687; *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011). A court need not address both elements if the petitioner fails to demonstrate either one of them. *Strickland v. Washington*, 466 U.S. at 697; *Garcia v. State*, 425 S.W.3d 248, 257 (Tenn. 2013). Each element of the *Strickland* analysis involves a mixed question of law and fact – a question this Court will review de novo without a presumption that the courts below were correct. *Williams v. Taylor*, 529 U.S. 362, 419 (2000); *Strickland v. Washington*, 446 U.S. at 698; *Davidson v. State*, ___ S.W.3d ___, ___, 2014 WL 6645264, at *3 (Tenn. 2014); *Calvert v. State*, 342 S.W.3d 477, 485 (Tenn. 2011).

Deficient performance means that "counsel's representation fell below an objective standard of reasonableness." To determine whether counsel performed reasonably, a reviewing court must measure counsel's performance under "all the circumstances" against the professional norms prevailing at the time of the representation. *Strickland v. Washington*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d at 932-33. Counsel's performance is not deficient if the advice given or the services rendered "are within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d at 936; *see also Harrington v. Richter*, 562 U.S. 86, ___, 131 S. Ct. 770, 778 (2011) ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." (quoting *Strickland v. Washington*, 466 U.S. at 690)); *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) ("[Deficient performance] is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms' [considering all the circumstances]." (internal citations omitted)).

In *Strickland v. Washington*, the United States Supreme Court discussed the interaction between counsel's duty to investigate and counsel's freedom to make reasonable strategic choices:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland v. Washington*, 466 U.S. at 690-91.

A *Strickland* analysis, therefore, begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions. *Strickland v. Washington*, 466 U.S. at 689. The petitioner bears the burden of overcoming this presumption. *Strickland v. Washington*, 466 U.S. at 687; *see also Burt v. Titlow*, 571 U.S. ___, ___, 134 S. Ct. 10, 17 (2013); *Nesbit v. State*, 2014 WL 5901964, at *3; *State v. Burns*, 6 S.W.3d 453, 461-62 (Tenn. 1999). Reviewing courts should resist the urge to judge counsel's performance using "20-20 hindsight." *Mobley v. State*, 397 S.W.3d 70, 80 (Tenn. 2013) (quoting *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)); *see also Strickland v. Washington*, 466 U.S. at 689 (instructing reviewing courts to try "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time").

The second element of the *Strickland* analysis focuses on whether counsel's deficient performance "prejudiced" the defendant. *Strickland v. Washington*, 466 U.S. at 687. The question at this juncture is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (citing *Strickland v. Washington*, 466 U.S. at 687). To prove prejudice, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. at 694. A "reasonable probability" is a lesser burden of proof than "a preponderance of the evidence." *Williams v. Taylor*, 529 U.S. at 405-06; *Pylant v. State*, 263

S.W.3d 854, 875 (Tenn. 2008). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. at 694; *see also Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006); *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

## III.

Mr. Kendrick's claims regarding the ineffectiveness of his trial counsel necessitate a careful review of his November 1994 trial. Each side clearly presented their theory of the case in their opening statements to the jury. The State told the jury:

> It's the State's theory that Edward Kendrick escorted his wife outside [of the gas station where she worked] to execute her and that's what he did. He took her outside, removed his Remington 7400 .30-06 hunting rifle from the back of his car and in front of his two small children, leveled the weapon, pointed it at his wife and shot her at point-blank range one time, dead center in the chest.

In his opening statement, Mr. Kendrick's trial counsel told the jury the State would not be able to prove "intent" or "premeditation":

> Lisa Kendrick was killed but not by Edward Kendrick. Lisa Kendrick was killed by a faulty rifle that was being transferred from the front of [their station wagon] to the back, . . . and the gun went off. The State would have you believe there is no merit . . . to that defense, but because [a crime scene investigator] picked up this gun at the scene they are going to have to put him on. You can ask yourself . . . why [that crime scene investigator] was shot in the foot with his hand nowhere near the trigger with the very same weapon. I'll ask him that for you.

The State's first witnesses were persons who were at the gas station when Ms. Kendrick was shot. Timothy Benton, the person who followed Mr. Kendrick from the gas station to the airport following the shooting, testified that he heard an explosion as he was pulling out of the gas station and that when he turned around, he saw Mr. Kendrick holding a rifle with the barrel pointed straight up in the air. He stated that Mr. Kendrick's "right hand was on the pistol grip area around the trigger and [his] left hand was up near the stock." Mr. Benton also testified that Mr. Kendrick was standing over Ms. Kendrick's motionless body.

-7-

The State then called Lennell Shepheard, a friend of Ms. Kendrick who was talking with Ms. Kendrick in the gas station when Mr. Kendrick arrived. Mr. Shepheard testified that Mr. Kendrick asked his wife to come outside because he had something to show her. He also testified that when he heard the shot, he walked from the counter to the door of the gas station and, when he opened the door, he saw Mr. Kendrick standing over his wife's body. Mr. Shepheard testified that he heard Mr. Kendrick "yelling 'I told you so' . . . about six times." He also stated that he went back inside the gas station after he and Mr. Kendrick made eye contact.

On cross-examination, Mr. Kendrick's lawyer suggested that Mr. Shepheard had not mentioned in his earlier statements that he heard Mr. Kendrick say "I told you so" and insinuated that Mr. Shepheard had fabricated this portion of his testimony. Mr. Shepheard responded that he had reported Mr. Kendrick's statement to an officer at the scene and later to one of the district attorney's investigators. The lead investigator, Detective Mark Rawlston, later testified that an audio recording of Mr. Shepheard's statement at the scene contained no reference to Mr. Kendrick's saying "I told you so."

The jury heard the 9-1-1 telephone calls made by two witnesses at the scene, as well as the call Mr. Kendrick made from the airport. "I want to turn myself in," Mr. Kendrick said, "My wife, I just shot my wife . . . I'm parked at the airport." When the 9-1-1 operator asked, "Why did you shoot her?" Mr. Kendrick only responded, "Yes." Thereafter, the conversation turned to where Mr. Kendrick was located at the airport.

Mr. Kendrick's trial counsel made sure that the jury heard early and often that Sergeant Miller, one of the crime scene investigators, had been shot in the foot while handling Mr. Kendrick's rifle. During cross-examination by Mr. Kendrick's lawyer, Detective Rawlston testified that he did not consider the possibility that Mr. Kendrick's rifle had accidentally discharged. This answer prompted Mr. Kendrick's lawyer to ask, "What about when the crime scene technician lifted the gun out of the trunk of his car and shot himself in the foot with it, saying all the time that his finger was nowhere near the trigger, what about that, that wasn't an issue you thought worthy of investigation?" Detective Rawlston responded that he did not consider the possibility of an accidental discharge because when he first interviewed Mr. Kendrick following his arrest, Mr. Kendrick "never at any time indicated to me that this was an accidental discharge." To the contrary, Mr. Kendrick told him, "I hope this is only a dream."

Testifying after Detective Rawlston, Sergeant Miller explained that after he retrieved the rifle from the side of the road and drove it to the police service center, "the weapon discharged and it struck [him] in the left foot" as he was removing it from the trunk of his automobile. Sergeant Miller said that he was holding a coat in his left hand and that he

picked up the weapon with his right hand with the barrel "pointed down towards the pavement." He also testified that he had "no recollection of how the weapon discharged."

When asked to demonstrate for the jury how he was holding the rifle when it fired, Sergeant Miller held the weapon without putting his finger on the trigger. However, when the prosecutor specifically asked him if he remembered whether his finger was on the trigger when the rifle discharged, Sergeant Miller stated that he did not remember.

Mr. Kendrick's trial counsel continued this line of questioning when he cross-examined Sergeant Miller, even though Sergeant Miller insisted that he did not recall whether his finger touched the trigger when the rifle discharged. The following colloquy took place:

> Q: Did you ever have your finger on the trigger when it discharged?
>
> A: I don't recall.
>
> Q: Well, didn't you, in fact, tell – there is an investigation and review of any time an officer is shot, is that correct?
>
> A: I don't remember anybody coming, you know, the people that generally do that, I don't believe they came.
>
> Q: You never made any statement to those people that your finger was not on the trigger?
>
> A: Not that I recall because most of my statement was made when I was in the hospital and what we do is fill out what's called an EOF, if something that happens to you on duty and when you get injured. And that was made when I was in the hospital.
>
> Q: Well, you wouldn't shoot yourself in the foot intentionally, would you?
>
> A: No, sir.
>
> Q: How long have you been a police officer?

A: Going on 22 years.

Q: When you picked up the gun and you showed the jury how you turned, you had your hand just like that?

A: Right.

Q: You don't put your finger on the trigger, do you?

A: No, sir.

Q: Okay. So when you turned the gun around is when it went off?

A: That's what I've described.

Q: As you swung around the gun swung around with you and your hand just like that and the gun went off, is that correct?

A: But I can't say that night that was the exact position of my hand, is what I'm saying.

Q: Well, in 22 years as a police officer, have you ever discharged a gun before accidentally into your foot?

A: No, sir.

Q: Okay. Or in any other part of your body?

A: No, sir.

Q: Or any other way?

A: No, sir.

Q: And you've been [a crime scene investigator] since 1988, some six years. Have you ever had a gun accidentally discharge as you – at the crime scene or anything else?

A: No, sir.

Q: Okay. How many times a day is it drilled into you at the police academy don't ever put your hand on the trigger unless you're going to shoot the gun, that's pretty standard, isn't it?

A: Yes, sir.

Q: Would you ever put your finger on the trigger of a gun you're lifting out of your car, especially when, as you say, you knew the gun was loaded?

A: Not knowingly, no.

Q: Well, now come on, you're waffling aren't you?

A: No.

Q: Well, you told them that you never had your finger on the trigger, you didn't shoot the gun, did you not tell them that?

A: I didn't intentionally shoot the gun, no.

Q: Okay. And you know not to put your finger on the trigger of a loaded gun unless you want to shoot it, don't you?

A: That's correct.

Q: And you've practiced that rule for the past 22 years, have you not?

A: Yes.

During his recross-examination of Sergeant Miller, Mr. Kendrick's trial counsel returned to the manner in which Sergeant Miller picked up and carried the rifle:

Q: So [to] the best of your recollection your finger was not on the trigger?

A: That night I can't say, I showed you how I thought I took it out.

-11-

Q: Well, you just said to the best of your recollection you showed us how you took it out of the trunk of the car.

A: Right.

Q: And to the best of your recollection, since you showed us, when you showed us, you showed us having the gun like this, finger off the trigger.

A: Right.

Q: To the best of your recollection, your finger was not on the trigger was it?

A: I might –

Q: Did you show us to the best of your recollection?

A: Yes, I did.

Q: Was your finger on the trigger when you showed us?

A: Not in this courtroom, no.

Q: Is that to the best of your recollection how it happened?

A: Yes.

Q: Thank you.

The Kendricks' four-year-old daughter testified on direct examination that she saw Ms. Kendrick "standing with her hands up." She also demonstrated how Mr. Kendrick was holding his rifle and testified that she saw Mr. Kendrick shoot Ms. Kendrick. During cross-examination, the child was questioned closely about whether her maternal grandparents had coached her to say "bad things" about Mr. Kendrick. Thereafter, she gave ambiguous answers regarding whether she had seen her mother with her hands up or whether she had "actually see[n] what happened."

Following the child's testimony, the State called the Hamilton County Medical Examiner who gave an opinion about how Ms. Kendrick was standing at the time she was

-12-

shot. The medical examiner testified (1) that Ms. Kendrick sustained a high velocity, fatal gunshot wound in the left chest that caused massive internal injuries, (2) that Ms. Kendrick's wound was a "near gunshot wound" which meant that Mr. Kendrick's rifle was close enough to Ms. Kendrick that the muzzle blast contacted Ms. Kendrick's body causing stipple injuries on the back of both of her forearms, (3) that Ms. Kendrick was leaning slightly away from Mr. Kendrick when she was shot, and (4) that the stipple injuries on the back of Ms. Kendrick's forearms indicated that Ms. Kendrick's forearms were raised and facing the direction of fire when she was shot.

The State then called Kelly Fite, a firearms examiner employed by the Georgia Bureau of Investigation who had examined Mr. Kendrick's rifle at the request of the Chattanooga Police Department. Agent Fite explained how the rifle's firing mechanism worked. He also testified that he had performed tests, including drop tests, to determine whether the rifle could fire without the trigger being pulled and that he had been unable to make the rifle fire without the safety being disengaged and pulling the trigger. When asked to give an opinion regarding whether the Remington Model 7400 was "susceptible to accidental misfire," Agent Fite stated: "The only way that you can fire this rifle without breaking it is by pulling the trigger."

Mr. Kendrick's trial counsel requested a jury-out hearing regarding the scope of his cross-examination of Agent Fite. He asked the trial court whether he could question Agent Fite about the Remington Model 742 rifle, a precursor to the Model 7400 rifle. In response to the State's objection, the trial court held that this line of questioning was irrelevant because it concerned a model of rifle that was different from Mr. Kendrick's rifle.

During the same jury-out hearing, Mr. Kendrick's trial counsel asked the trial court to permit him to use an official incident report relating to Sergeant Miller's injury prepared by Detective Glenn Sims to refresh Sergeant Miller's memory. This report attributed a statement to Sergeant Miller that "he picked the gun up with both hands and that his finger was not near the trigger[.] [A]s he lifted the weapon out [of the trunk], the rifle went off." When Sergeant Miller was recalled to the stand, he stated that he had never seen Detective Sims's report before and that he did not recall speaking to Detective Sims about the incident. The jury did not hear the contents of Detective Sims's report.[5]

---

[5]During closing arguments, the State characterized Sergeant Miller's accident as the only "accidental discharge" in the case:

> An accidental discharge of a weapon is when you take it out of the trunk of your car, it's late at night, you are overworked, you might get a little bit sloppy, and you shoot yourself in the foot. Okay? That's accidental discharge. That's what we had in this case. It wasn't the

(continued...)

After the State completed its case-in-chief, Mr. Kendrick's lawyer called Detective Sims. In response to the State's objection to this witness, Mr. Kendrick's lawyer explained that he was attempting to impeach Sergeant Miller with Detective Sims's report in accordance with Tenn. R. Evid. 613(b). However, the trial court sustained the State's objection, and Detective Sims did not take the stand.[6]

The attorney who had been representing Mr. Kendrick in the Kendricks' divorce proceeding testified that Mr. Kendrick suspected that his wife was having an affair and that he was "angry and discouraged" about it. However, the attorney also testified that Mr. Kendrick appeared to harbor no "aggressive feelings" toward Ms. Kendrick. Thereafter, two character witnesses testified on Mr. Kendrick's behalf.

At this point, Mr. Kendrick took the stand. He explained that he had owned the Remington Model 7400 rifle for eleven years and that it had never malfunctioned before. He explained that Ms. Kendrick carried a handgun and that he often kept a rifle with him because the Kendricks had a side job cleaning apartments at night in an area where they felt unsafe. He testified that he was moving the rifle to the back of the automobile at his wife's request when it discharged and that he was "almost positive" that he did not pull the trigger.

With reference to his conduct after Ms. Kendrick was shot, Mr. Kendrick stated that he did not attempt to assist his wife because he knew she was already dead. He explained that he left the gas station because "he wanted to get the kids away." He also testified that he threw the rifle out of the front passenger window because he was scared and that he "just wanted to get it out of the car." Mr. Kendrick denied saying "I told you so" as he watched his wife die.

In rebuttal, the State called Officer Martha Matson, a security officer working at the airport on the night of the incident who removed the Kendricks' children from their car seats. Invoking the excited utterance exception to the hearsay rule in Tenn. R. Evid. 803(2), the trial court permitted Officer Matson to testify that "[t]he little girl, when I got her out of the car,

---

[5](...continued)
weapon that was an accident, it was the officer. . . .

[6]On direct appeal, the Court of Criminal Appeals held that the trial court erred by refusing to permit Detective Sims to testify regarding the substance of the statements Sergeant Miller gave to the officers investigating his injury. However, the appellate court also decided that this error was harmless because Mr. Kendrick's lawyer had elicited testimony from Sergeant Miller during cross-examination that would have permitted the jury to conclude that Sergeant Miller's memory at the time of trial was faulty and that Sergeant Miller knew Mr. Kendrick had not caused the rifle to fire by pulling the trigger. *State v. Kendricks*, 947 S.W.2d at 881-82.

-14-

she just put her arms around me and she stated that she had told daddy not to shoot mommy but he did and she fell."

After closing arguments and deliberation, the jury found Mr. Kendrick guilty of first degree premeditated murder – a verdict that carries an automatic life sentence when the State has not sought the death penalty. *See* Tenn. Code Ann. § 39-13-202(c) (2014). Mr. Kendrick moved for a new trial. Following a hearing on May 15, 1995, the trial court entered an order denying the motion on June 19, 1995. The Court of Criminal Appeals upheld Mr. Kendrick's conviction and sentence. *State v. Kendricks*, 947 S.W.2d at 886. This Court denied Mr. Kendrick's Tenn. R. App. P. 11 application for permission to appeal.

**IV.**

The condition of Mr. Kendrick's Remington Mode 7400 rifle and the manner in which Sergeant Miller handled it were the focus of the hearing on Mr. Kendrick's petition for post-conviction relief, conducted almost sixteen years after his original trial. Mr. Kendrick presented Henry Jackson Belk, Jr., a gunsmith and former deputy sheriff, as a firearms expert. Mr. Belk testified that the Remington Model 7400 rifle contained the same trigger mechanism that was found in at least fourteen different models of Remington "pumps and automatics manufactured after 1948."[7]

Mr. Belk had examined Mr. Kendrick's rifle prior to testifying. He found that the rifle was dirty on the inside, but he did not find any debris in the trigger mechanism that could cause it to misfire.[8] Mr. Belk was unable to make the trigger mechanism fire without pulling the trigger, except when he removed the trigger mechanism from the rifle. Nonetheless, Mr. Belk testified that the firing mechanism in Mr. Kendrick's rifle was a "defective mechanism" because these mechanisms have "a history of firing under outside influences other than a manual pull of the trigger."

Mr. Belk testified that he first became suspicious about the trigger mechanism in 1970, but that it was not until 1994 – the same year as Mr. Kendrick's trial – that he served as an expert in a civil case involving the trigger mechanism in a Remington 700 rifle. In response to the State's questioning, Mr. Belk concurred that, if someone had done research at the time of Mr. Kendrick's 1994 trial, they would have potentially been able to find him.

---

[7]Mr. Belk stated that this trigger mechanism could be found in approximately 23 million weapons.

[8]Mr. Belk speculated that there could have been debris in the firing mechanism of Mr. Kendrick's rifle and that Agent Fite's drop tests could have dislodged it.

-15-

Mr. Belk described several instances in which a malfunction caused a similar Remington rifle to fire. In one instance, a Model 1100 shotgun fired when a man grabbed it while it was falling. In another case, a Model 870 shotgun fired while it sat, with the safety on, inside a locked box that was mounted on an ATV with its engine running. Mr. Belk also recalled testifying about the Model 7400 rifle in two civil cases and one criminal case. In the "late nineties," he testified in a civil case involving a Model 7400 that allegedly misfired when a man was wiping it with a rag. In another case, which he did not date, Mr. Belk testified about a Model 7400 that allegedly misfired while it was being cleaned with an air hose. Mr. Belk also recalled "sign[ing] affidavits about a 7400 criminal case in Washington State," but he did not testify when he signed the affidavits.

Sergeant Miller also testified at the post-conviction hearing. He maintained that he still could not remember whether his finger touched the trigger of Mr. Kendrick's rifle when he shot himself in the foot and that he had no recollection of talking with other officers about the incident. He added that he had sustained a "massive foot injury" and that he was on pain medication. Sergeant Miller also testified that he spent over three weeks in the hospital and that he had had seven surgeries on his foot.

Mr. Kendrick also called the three officers who talked with Sergeant Miller after he shot himself in the foot. Officer Michael Holbrook, who prepared a report about Sergeant Miller's injury after visiting him the hospital, testified that Sergeant Miller told him that "his finger was not near the trigger" when the rifle fired. Detective Sims, now retired, testified that he did not recall the circumstances surrounding his report concerning Sergeant Miller's injury. Finally, Officer James Gann, the first officer to render assistance to Sergeant Miller, testified that Sergeant Miller "was in a lot of pain, bleeding and starting to go into shock" after the accident.

The assistant public defender who represented Mr. Kendrick during his November 1994 trial also testified at the hearing on Mr. Kendrick's post-conviction petition. He testified that Mr. Kendrick did not tell the police that the shooting had been accidental before he began representing Mr. Kendrick. He also confirmed that his theory of defense from the outset was that the shooting was an accident caused by a defective weapon and that he considered Sergeant Miller's mishap to be the key fact establishing that Mr. Kendrick's rifle could have been defective.

Counsel testified that he was somewhat knowledgeable about guns because he owned a number of them. He also stated that the public defender's office occasionally consulted a former police officer who was a gunsmith but that he could not remember whether this office consulted this gunsmith in Mr. Kendrick's case. He added that gun owners in 1994 were not aware of any inherent defects in Remington's trigger mechanism because "there was no

discussion in the industry about the trigger mechanism on the Remington being potentially able to malfunction." Counsel also pointed out that "you couldn't Google Remington trigger mechanisms back then" and that the "body of evidence" concerning the Remington trigger mechanism that eventually came to light "wasn't available at that point in time [the time of Mr. Kendrick's trial in November 1994]."

The assistant public defender also testified that he knew that Agent Fite would be called to testify that Mr. Kendrick's rifle was working properly. He explained that he never looked for an expert witness to rebut Agent Fite because he believed that he could use Sergeant Hill's statements "very effectively." Counsel believed that Sergeant Miller's testimony about his accidental injury would "trump[]" Agent Fite's testimony. He also believed "that [Sergeant] Miller shooting himself in the foot accidentally, without his hands near the trigger, was enough for a reasonable doubt as to anything."[9]

While Mr. Kendrick's trial counsel had not personally interviewed Sergeant Miller, he was aware of the interview that one of the public defender's investigators had conducted. He testified that he "thought [Sergeant] Miller would testify consistently with what [he] knew to be his statements" and that he "presumed [that he] would be able to get [Sergeant] Miller's testimony that he was not holding the trigger and the gun discharged" before the jury to bolster his theory that the shot that killed Ms. Kendrick was fired accidentally.

Counsel also testified that he felt "sandbagged" and "overwhelmed" when Sergeant Miller testified that he could not remember where his finger was when he was shot. He added that "I was not prepared for [Sergeant] Miller to say that he couldn't remember, because there was not any doubt in my mind, at least, when we started trying this case, that he was going to stick to his prior statements."

The assistant public defender also testified that he did not recall whether he considered attempting to admit Sergeant Miller's statements as excited utterances after his attempt to use them to impeach Sergeant Miller failed. He testified initially that he did not know when the reports were taken and that he was unsure about whether Sergeant Miller's statements were sufficiently "contemporaneous" to qualify as excited utterances. Later in his testimony, counsel agreed that, "in hindsight," the statements might have been admissible as excited utterances. However, he added that "in the heat of trial, I didn't see that."

---

[9]Mr. Kendrick's trial counsel testified that years after Mr. Kendrick's trial, he telephoned Mr. Kendrick's post-conviction counsel as soon as he heard a radio program discussing several accidental deaths associated with Remington's trigger mechanism.

The post-conviction court denied Mr. Kendrick's petition for post-conviction relief. In its 66-page order, the court determined that Mr. Kendrick had not been prejudiced by his counsel's decision not to call an expert witness to rebut Agent Fite. The court reasoned:

> Even if one disregards Mr. Fite's trial testimony suggesting that accidental discharge was impossible and accepts Mr. Belk's testimony indicating that, because of the trigger mechanism in the gun, accidental discharge was possible, significant weaknesses in the theory of the defense, specifically, unfavorable eyewitness evidence and the petitioner's own ambiguous actions in leaving the scene and discarding the gun, still remain.

> \* \* \*

> Although Mr. Belk's post-conviction testimony reveals apparent gaps in Agt. Fite's knowledge about defects in the common trigger mechanism and the inutility of drop tests, the jury did not require Mr. Belk or another expert witness to make them aware of the possibility of accident. Off. Miller's injury was an immediate reminder, if any was necessary, that accident is always a possibility.

> Furthermore, because Mr. Belk did not explain his dismissal of drop tests, his testimony on this issue is relatively weak. In any event, the effect of Agt. Fite's trial testimony was not to exclude the possibility of accident but to limit it to a particular circumstance, a triggered discharge. Although Mr. Belk's testimony raises the possibility of an untriggered discharge, even the petitioner at trial was not entirely certain whether, at the time of discharge, his finger or hand was on the trigger.

In addition, the post-conviction court declined to grant post-conviction relief with regard to the "excited utterance" issue. The court first decided that the statements were not excited utterances, but rather were "post-accident statements in the course of internal and defense investigations." The court also decided that Mr. Kendrick had not been prejudiced because the Court of Criminal Appeals had already determined on direct appeal that the trial court's decision to disallow the use of Sergeant Miller's post-accident statements as impeachment evidence was harmless error.

## V.

The Court of Criminal Appeals reversed the post-conviction court's denial of Mr. Kendrick's petition. The appellate court decided that Mr. Kendrick's counsel was deficient in two respects and that, absent these deficiencies, it was reasonably likely that the jury would have convicted Mr. Kendrick of a lesser degree of homicide. *Kendrick v. State*, No. E2011-02367-CCA-R3-PC, 2013 WL 3306655, at *13-14, 17 (Tenn. Crim. App. June 27, 2013).

The appellate court began its analysis by pointing out that Mr. Kendrick had three types of evidence available to him to establish his accidental shooting defense. The first was his own testimony – the effectiveness of which hinged on his own credibility. The second was evidence that Sergeant Miller had shot himself with the rifle without touching the trigger, which would have bolstered not only Mr. Kendrick's defense but also his credibility. The third type of evidence would have been expert testimony that the trigger mechanism on his rifle was defective and that the rifle could fire without the trigger being pulled. This evidence would likewise have bolstered Mr. Kendrick's defense and his credibility. *Kendrick v. State*, 2013 WL 3306655, at *13.

The Court of Criminal Appeals then held that Mr. Kendrick's trial counsel was "deficient in failing to adduce expert proof about the trigger mechanism in the rifle." *Kendrick v. State*, 2013 WL 3306655, at *13. In the court's view, Mr. Belk's testimony was "absolutely crucial" to the "key question" of whether Mr. Kendrick's rifle fired without the trigger being pulled. *Kendrick v. State*, 2013 WL 3306655, at *13. Because Mr. Belk testified about the problems with the "Common Fire Control" in 1994 and was aware of these problems before that date, the court decided that Mr. Kendrick's trial counsel should have worked harder to find Mr. Belk or presumably an equivalent expert prior to the trial in November 1994. *Kendrick v. State*, 2013 WL 3306655, at *13.

The Court of Criminal Appeals also decided that Mr. Kendrick's trial counsel was "deficient in failing to adduce, as substantive evidence, Sgt. Miller's pretrial statements that the rifle had fired while he was handling it and while his hands were not near the trigger." *Kendrick v. State*, 2013 WL 3306655, at *14. The appellate court believed the "crucial" statements Sergeant Miller made both in the parking lot and in the hospital were admissible hearsay under the "excited utterance" exception.[10] Thus, "when Sgt. Miller's memory proved unreliable at the trial," counsel should have called the officers who heard Sergeant Miller's

---

[10]*See* Tenn. R. Evid. 803(2) ("Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition [is not excluded by the hearsay rule].").

statements. Moreover, the appellate court decided that Mr. Kendrick's trial counsel "should have anticipated a forgetful witness and been prepared to adduce the proof, of which he was aware, in another manner." *Kendrick v. State*, 2013 WL 3306655, at *14.

Turning to the prejudice prong of *Strickland v. Washington*, the Court of Criminal Appeals addressed whether the post-conviction court had applied an incorrect legal standard in its assessment of the adequacy of Mr. Kendrick's proof supporting his ineffective assistance of counsel claim. The appellate court focused on the following two portions of the post-conviction court's October 13, 2011 order:

> The Court agrees with [Mr. Kendrick] that this new evidence is favorable to the defense. The petitioner, however, must prove more than this; he must prove by clear and convincing evidence that the new evidence is so favorable that counsel's failure to present it at trial had an effect on the verdict. This, the Court finds, he does not do.
>
> *          *          *
>
> The standard for post-conviction relief is high: clear and convincing evidence. On appeal, there was sufficient evidence to support the conviction. Now, after the post-conviction hearing, the Court cannot say that there is clear and convincing evidence that the victim's death was an accident or even that it was only knowing, not premeditated.

The appellate court correctly pointed out that the Post-Conviction Procedure Act requires petitioners to prove their allegations of fact by clear and convincing evidence. Tenn. Code Ann. § 40-30-110; Tenn. Sup. Ct. R. 28, § 8. Once the facts are established, the post-conviction court should conduct a straightforward *Strickland v. Washington* analysis to reach the legal conclusion of whether deficient performance and prejudice existed. *Kendrick v. State*, 2013 WL 3306655, at *15-16; *see also Dellinger v. State*, 279 S.W.3d at 293-94.

Having already decided that Mr. Kendrick's trial counsel's failure to retain the expert assistance of Mr. Belk or his equivalent was deficient performance, the Court of Criminal Appeals decided that this failure prejudiced Mr. Kendrick "in a number of ways." *Kendrick v. State*, 2013 WL 3306655, at *16. First, Mr. Belk's testimony would have corroborated Mr. Kendrick's version of events and thereby enhanced his credibility. *Kendrick v. State*, 2013 WL 3306655, at *16. Second, Mr. Belk's testimony could have discredited the testimony of the State's firearms expert, Agent Fite. *Kendrick v. State*, 2013 WL 3306655,

at *17. Third, Mr. Belk's expert testimony would have given the jury "an additional reason to suspect [Mr.] Shepheard's testimony" that Mr. Kendrick said "I told you so" to his dying wife. Instead, the jury was "deprived of this critical choice" to accept or reject the fact, supported by expert testimony, that the rifle was defective. *Kendrick v. State*, 2013 WL 3306655, at *17.

The Court of Criminal Appeals also decided that Mr. Kendrick's trial counsel's failure to introduce Sergeant Miller's statements as substantive evidence deprived the jury of evidence that was "critical to the defense." *Kendrick v. State*, 2013 WL 3306655, at *17. Particularly in light of the trial judge's post-trial statement that he thought the case was "awfully close" on the facts, the appellate court found it "reasonably likely" that, had the jury heard Mr. Belk's testimony and Sergeant Miller's excited utterances, they would have convicted Mr. Kendrick of a lesser degree of homicide. *Kendrick v. State*, 2013 WL 3306655, at *17.

The Court of Criminal Appeals noted that Mr. Kendrick had alleged other deficiencies on the part of his trial and appellate counsel. However, after deciding that the two foregoing deficiencies were, by themselves, enough to require a new trial, the court deemed it unnecessary to address Mr. Kendrick's remaining claims. *Kendrick v. State*, 2013 WL 3306655, at *18.

**VI.**

We now turn to the first of the two grounds for the Court of Criminal Appeals' conclusion that Mr. Kendrick's trial counsel's performance was sufficiently deficient and prejudicial to warrant granting Mr. Kendrick a new trial. The court decided that counsel's failure to find and present a firearms expert to testify that the trigger mechanism on Mr. Kendrick's rifle was defective fell below the range of competence demanded of attorneys trying criminal cases in Tennessee.

**A.**

Two recent opinions of the United States Supreme Court addressing the duty of defense counsel to procure expert testimony to rebut the State's expert testimony are germane to the question of whether Mr. Kendrick's counsel's decision not to seek and retain a firearms expert warrants post-conviction relief.

The first opinion is *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770 (2011). This case stemmed from the shooting of Joshua Johnson and Patrick Klein in Mr. Johnson's home. When the police arrived, they found Mr. Klein lying on a couch in the living room and Mr.

Johnson in the bedroom. Mr. Klein later died, but Mr. Johnson survived and identified Joshua Richter and Christian Branscombe, who earlier had been smoking marijuana with Messrs. Johnson and Klein, as the shooters. Messrs. Richter and Branscombe were charged with the murder of Mr. Klein, the attempted murder of Mr. Johnson, and related charges. *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 781.

Mr. Richter argued self-defense at trial. He asserted that he and Mr. Branscombe were in a bedroom with Messrs. Johnson and Klein when Messrs. Johnson and Kline attacked them. He insisted that he and Mr. Branscombe fired in self-defense and that Mr. Johnson must have dragged Mr. Klein from the bedroom to the couch where the police found him. *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 782.

While the State made reference in its opening statement to the ballistics evidence it planned to introduce, it made no reference to blood-related evidence because the State did not plan to introduce evidence regarding the blood found in the house. However, the State changed its strategy after Mr. Richter's trial counsel claimed in his opening statement that the State's investigation had been deficient. Without advance notice, and over defense counsel's objection, the State called two additional experts – one an expert in blood spatter evidence and the other a serologist. The blood spatter expert testified that the blood spatters at the crime scene indicated that Mr. Klein had been shot on or near the couch where he was discovered. The serologist testified that the blood taken from the bedroom door could not have come from Mr. Klein. Defense counsel cross-examined both witnesses and exposed weaknesses in their analyses. Nevertheless, the jury convicted Mr. Richter of all charges, and his convictions were upheld on direct appeal. *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 782.

Mr. Richter petitioned the California Supreme Court for a writ of habeas corpus. He claimed that his trial counsel had been deficient by failing to present expert testimony regarding "serology, pathology, and blood spatter." To buttress his claim, he offered affidavits of two serologists, a pathologist, and an expert in blood stain analysis, each of whom offered an interpretation of the crime scene evidence that was at odds with the testimony of the experts the State had called at trial. The California Supreme Court denied Mr. Richter's petition.

The United States District Court for the Eastern District of California and a three-judge panel of the United States Court of Appeals for the Ninth Circuit found Mr. Richter's federal petition for writ of habeas corpus to be without merit. *Harrington v. Richter*, 131 S. Ct. at 783. However, the United States Court of Appeals for the Ninth Circuit, sitting en banc, found that Mr. Richter was entitled to federal habeas corpus relief. Presumably applying the standard of review required by the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEDPA"), the court decided that Mr. Richter's counsel had been deficient because he should have consulted experts on blood evidence (1) to determine an effective trial strategy and (2) to rebut the State's potential expert evidence. *Harrington v. Richter*, 131 S. Ct. at 783 (citing *Richter v. Hickman*, 578 F.3d 944 (9th Cir. 2009)).

The United States Supreme Court granted California's petition for writ of certiorari and held that the Ninth Circuit had failed to give proper deference under the AEDPA to the California Supreme Court's decision. The Court held that under 42 U.S.C. 2254(d) (West 2012), the "pivotal question is whether the state court's application of the *Strickland* standard was unreasonable" and that this question required a higher degree of deference than the related question of "whether defense counsel's performance fell below *Strickland*'s standard." *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 785. Accordingly, the Court held that the Ninth Circuit had erred when it "explicitly conducted a *de novo* review" under the *Strickland v. Washington* standard. Even had there been "a strong case for relief," this would not mean the state court's contrary conclusion was "unreasonable." *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 786.

The Court then turned its attention to Mr. Richter's *Strickland v. Washington* claim. It stressed that "[s]urmounting *Strickland*'s high bar is never an easy task." *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 788 (quoting *Padilla v. Kentucky*, 559 U.S. 371). Because it is "all too tempting" for a reviewing court to "second-guess" a defense attorney's trial decisions, "the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 788 (quoting *Strickland v. Washington*, 466 U.S. at 689-90). The question under *Strickland v. Washington's* deficient performance prong is "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 788 (quoting *Strickland Washington*, 466 U.S. at 690). According to the Court, *Strickland v. Washington's* prejudice prong requires that counsel's error be "so serious as to deprive the defendant of a fair trial," meaning "a trial whose result is reliable." *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 787-88 (quoting *Strickland v. Washington*, 466 U.S. at 687).

The United States Supreme Court's discussion of counsel's performance concerning expert testimony is particularly germane to Mr. Kendrick's case:

> The Court of Appeals first held that Richter's attorney rendered constitutionally deficient service because he did not consult blood evidence experts in developing the basic strategy for Richter's defense or offer their testimony as part of the principal

-23-

case for the defense. *Strickland*, however, permits counsel to "make a reasonable decision that makes particular investigations unnecessary." [*Strickland*, 466 U.S. at 691]. It was at least arguable that a reasonable attorney could decide to forgo inquiry into the blood evidence in the circumstances here.

Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both. There are, however, "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." [*Strickland v. Washington*, 466 U.S. at 689]. Rare are the situations in which the "wide latitude counsel must have in making tactical decisions" will be limited to any one technique or approach. [*Strickland v. Washington*, 466 U.S. at 689]. It can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts, but even that formulation is sufficiently general that state courts would have wide latitude in applying it. Here it would be well within the bounds of a reasonable judicial determination for the state court to conclude that defense counsel could follow a strategy that did not require the use of experts regarding the pool [of blood] in the doorway to [the] bedroom.

*Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 788-89.

The Court noted that before trial, counsel could have considered "any number of hypothetical experts – specialists in psychiatry, psychology, ballistics, fingerprints, tire treads, physiology, or numerous other disciplines and subdisciplines – whose insight might possibly have been useful." But pursuing these experts could have distracted counsel from "more important duties." *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 789 (quoting *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) (per curiam)). "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 789. "Even if it had been apparent that expert blood testimony could support Richter's defense, it would be reasonable to conclude that a competent attorney might elect not to use it." *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 789.

The Court also observed that the Ninth Circuit's theory of the defense "overlooks the fact that concentrating on the blood pool carried its own serious risks." *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 789. The Court noted that defense counsel had good reason to question his client's truthfulness regarding the details of the crime and that they could have ended up undercutting their client's defense had they hired their own forensic experts. *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 789-90. "Even apart from this danger," the Court said, "there was the possibility that expert testimony could shift attention to esoteric matters of forensic science, distract the jury from whether [the surviving victim] was telling the truth, or transform the case into a battle of the experts." *Harrington v. Richter*, 562 U. S. at ___, 131 S. Ct. at 790. In sum, the Court concluded that the Ninth Circuit erred by relying on "'the harsh light of hindsight' to cast doubt on a trial that took place now more than 15 years ago . . . precisely what *Strickland v. Washington* and AEDPA seek to prevent." *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 789 (quoting *Bell v. Cone*, 535 U.S. 685, 702 (2002)).

Although Mr. Richter's counsel's opening statement apparently prompted the State to introduce expert forensic blood evidence, the Court decided that "the prosecution's response shows merely that the defense strategy did not work out as well as counsel had hoped, not that counsel was incompetent." *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 790. Although the Court came close to saying that counsel's representation was not deficient, it did not need to go that far:

> If this case presented a *de novo* review of *Strickland*, the foregoing might well suffice to reject the claim of inadequate counsel, but that is an unnecessary step. The Court of Appeals must be reversed if there was a reasonable justification for the state court's decision. In light of the record here[,] there was no basis to rule that the state court's determination was unreasonable.

*Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 790.

The Court then turned to the Ninth Circuit's second finding – that Mr. Richter's counsel was deficient "because he had not expected the prosecution to offer expert testimony and therefore was unable to offer expert testimony of his own in response." *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 790-91. The Court decided that the Ninth Circuit erred by holding that "counsel had to be prepared for 'any contingency.'" *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 791 (quoting *Richter v. Hickman*, 578 F.3d at 946).

The Court noted that "[j]ust as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 791. Even if counsel had foreseen that the State would offer expert evidence, Mr. Richter would still be required to show that a reasonable attorney would have acted on that knowledge. In the Court's words: "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 791. Rather, "[i]n many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 791. Indeed,

> it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy. Here Richter's attorney represented him with vigor and conducted a skillful cross-examination. As noted, defense counsel elicited concessions from the State's experts and was able to draw attention to weaknesses in their conclusions stemming from the fact that their analyses were conducted long after investigators had left the crime scene. For all of these reasons, it would have been reasonable to find that Richter had not shown his attorney was deficient under *Strickland*.

*Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 791.

The United States Supreme Court also held that, assuming counsel was deficient, the Ninth Circuit erred by finding prejudice. *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 792. Justice Ginsburg concurred separately. Although she believed counsel had been deficient "[i]n failing even to consult blood experts in preparation for the murder trial," she did not believe this prejudiced Mr. Richter. *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 793 (Ginsburg, J., concurring).

The second opinion is *Hinton v. Alabama*, 571 U.S. __, 134 S. Ct. 1081 (2014). This case arose from a series of deadly restaurant robberies in Birmingham, Alabama. The managers in each of the three restaurants were shot twice with .38 caliber bullets. Two of the managers died, but the third survived. The authorities recovered all six bullets. After Anthony Ray Hinton was arrested for these crimes, the authorities also recovered a .38 caliber revolver from his house. Examiners from Alabama's Department of Forensic

Services used "toolmark" evidence[11] to conclude that all six bullets had been fired from Mr. Hinton's gun. *Hinton v. Alabama*, 571 U.S. at ___, 134 S. Ct. at 1083-84.

Mr. Hinton was tried for capital murder for the first two robberies. The State's strategy was to use the surviving victim's eyewitness testimony to link Mr. Hinton to the third robbery, and then to use the toolmark evidence to link Mr. Hinton to the earlier robberies by showing that all six bullets had been fired from the same gun. In his defense, Mr. Hinton argued misidentification and presented alibi witnesses who claimed he was at work at the time of the third robbery. The six bullets and Mr. Hinton's revolver were the only physical evidence. As the United States Supreme Court later observed, "The State's case turned on whether its expert witnesses could convince the jury that the six recovered bullets had indeed been fired by the Hinton revolver." *Hinton v. Alabama*, 571 U.S. at ___, 134 S. Ct. at 1084.

Mr. Hinton's attorney realized that he needed to retain his own forensic expert because the State's case hinged on forensic evidence. Accordingly, the attorney filed a motion requesting funding for a rebuttal expert. Both the trial court and Mr. Hinton's counsel believed that $500 was the maximum amount that could be approved in each case. Accordingly, the trial court authorized $1,000 for Mr. Hinton to retain an expert in both cases. However, the trial court also told Mr. Hinton's attorney, "if you need additional experts I would go ahead and file on a separate form and I'll have to see if I can grant additional experts." *Hinton v. Alabama*, 571 U.S. at ___, 134 S. Ct. at 1084.

Regrettably, both the trial court and Mr. Hinton's attorney were mistaken about that maximum amount that Alabama law permitted for experts in cases such as Mr. Hinton's.[12] As it turned out, Mr. Hinton's attorney was unable to retain a reputable firearm and toolmark expert for $1,000. Accordingly, he settled on a witness with expertise in military ordinance whom he believed would be "usable." This witness had no training in firearm or toolmark

___

[11]Toolmarks are the impressions that are created when a hard object (a "tool" such as the firing pin of a gun or the rifling in a gun barrel) comes into contact with a relatively softer object (such as a bullet casing). The brass exterior of a cartridge case receives toolmarks when a gun fires because "the firing pin dents the soft primer surface at the base of the cartridge to commence firing." Extractors and ejectors also leave marks on used cartridges as they expel those cartridges from the gun. Firearms and toolmark examiners believe individual guns exhibit physical heterogeneities, and that a bullet may properly be traced to the gun from which it was fired by virtue of the unique imprints left by the gun's firing pin and related parts. National Academy of Sciences, *Strengthening Forensic Science in the United States: A Path Forward* 150-51 (2009), https://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf (hereinafter *NAS Report*).

[12]More than one year earlier, Alabama had amended its indigent defense statutes to provide that attorneys representing indigent defendants were "entitled to be reimbursed for any expenses reasonably incurred in such defense." *Hinton v. Alabama*, 571 U.S. at ___, 134 U.S. at 1084-85.

identification and had testified as an expert only twice during the prior eight years. The prosecution severely discredited this witness during cross-examination, even soliciting his concessions that he was visually impaired and that he had to seek assistance from one of the prosecution's experts to operate a microscope at the state forensic laboratory. Mr. Hinton was convicted and sentenced to death. *Hinton v. Alabama*, 571 U.S. at ___, 134 S. Ct. at 1085-86.

Mr. Hinton filed a petition for post-conviction relief, alleging his counsel was ineffective for failing to seek additional funds for expert testimony. Even though Mr. Hinton produced three credentialed experts who testified that they could not conclude that any of the six bullets had been fired from Mr. Hinton's revolver, the post-conviction court decided that Mr. Hinton was not entitled to post-conviction relief. The post-conviction court reasoned that Mr. Hinton had not been prejudiced because the testimony of the three new experts tracked the testimony of the "expert" called by Mr. Hinton at trial. The Alabama Court of Criminal Appeals affirmed.[13] The Alabama Supreme Court reversed the intermediate appellate court and remanded the case to the post-conviction court to determine whether the "expert" Mr. Hinton had called at his original trial had been qualified to testify as an expert witness.[14] On remand, the post-conviction court held that the trial expert had been qualified to testify under the standards in place at the time. The intermediate appellate court affirmed, and the Alabama Supreme Court denied review.[15]

The United States Supreme Court granted Mr. Hinton's petition for writ of certiorari and applied a "straightforward" *Strickland v. Washington* analysis. *Hinton v. Alabama*, 571 U.S. at ___, 134 S. Ct. at 1087. The Court found that Mr. Hinton's counsel had performed deficiently. It held that it was "unreasonable" for Mr. Hinton's lawyer "to fail to seek additional funds to hire an expert where that failure was based not on any strategic choice but on a mistaken belief that available funding was capped at $1,000." *Hinton v. Alabama*, 571 U.S. at ___, 134 S. Ct. at 1088. The attorney knew that "effectively rebutting" the State's theory – which relied on toolmark evidence – "required a competent expert on the defense side." But defense counsel felt he was "stuck" with the only witness he could afford at that price. *Hinton v. Alabama*, 571 U.S. at ___, 134 S. Ct. at 1088.

As it had noted in *Harrington*, the Court stated that "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or

---

[13]*Hinton v. State*, No. CR-04-0940, 2006 WL 1125605 (Ala. Crim. App. Apr. 28, 2006).

[14]*Ex Parte Hinton*, No. 1051390, 2008 WL 4603723 (Ala. Oct. 17, 2008).

[15]*Hinton v. State*, No. CR-04-0940, 2013 WL 598122 (Ala. Crim. App. Feb. 15, 2013).

introduction of expert evidence." *Hinton v. Alabama*, 571 U.S. at ___, 134 S. Ct. at 1088 (quoting *Harrington v. Richter*, 131 S. Ct. at 788). The Court found that Mr. Hinton's case "was such a case." *Hinton v. Alabama*, 571 U.S. at ___, 134 S. Ct. at 1088. While Mr. Hinton's attorney "knew that he needed more funding to present an effective defense," he "failed to make even the cursory investigation of the state statute providing for defense funding for indigent defendants." *Hinton v. Alabama*, 571 U.S. at ___, 134 S. Ct. at 1089.

The Court was careful to state precisely why the attorney's performance was constitutionally deficient:

> An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.

> \*         \*         \*

> We wish to be clear that the inadequate assistance of counsel we find in this case does not consist of the hiring of an expert who, though qualified, was not qualified enough. The selection of an expert witness is a paradigmatic example of the type of "strategic choic[e]" that, when made "after thorough investigation of [the] law and facts," is "virtually unchallengeable." *Strickland*, [466 U.S. at 690]. We do not today launch federal courts into examination of the relative qualifications of experts hired and experts that might have been hired. The only inadequate assistance of counsel here was the inexcusable mistake of law – the unreasonable failure to understand the resources that state law made available to him – that caused counsel to employ an expert that *he himself* deemed inadequate.

*Hinton v. Alabama*, 571 U.S. at ___, 134 S. Ct. at 1089.

*Harrington* and *Hinton* provide a useful lens for assessing allegations of ineffective assistance that relate to the failure to investigate or retain expert testimony. There are cases, such as *Hinton*, in which a defense attorney bears an affirmative duty to consult an expert, and perhaps to call an expert as a rebuttal witness. From *Hinton*, we learn that when the prosecution's theory of the case hinges on expert forensic science testimony, the acquisition

of an expert witness for the defense may be exactly what professional norms under *Strickland v. Washington* require.

In most cases, however, the decision to select an expert, or which expert to select, constitutes one of the "strategic" defense decisions that *Strickland v. Washington* shields from scrutiny. In many cases, cross-examining the prosecution's expert will be just as effective as, and less risky than, utilizing a rebuttal expert. Each case must stand on its own facts.

**B.**

Expert testimony and forensic science evidence, in particular, have become crucial to many criminal cases. Many cases hinge on DNA evidence, blood toxicology reports, the identification of latent fingerprints, voice recognition, handwriting analysis, toolmark evidence, the analysis of bite marks, shoe prints and tire tracks, and other evidence that falls under the broad umbrella of "forensic science." The use of forensic science evidence has blossomed over recent decades, but in this century, forensic science practitioners have faced criticism from attorneys, scientists, legislators, and others. *See generally NAS Report.* As the Innocence Project reports, 316 prisoners have been exonerated by post-conviction DNA testing, and approximately half of these wrongful convictions can be attributed, in some way, to deficiencies and errors in forensic science.[16]

Due to the ubiquity and persuasive power of forensic science evidence, it has become necessary for defense counsel to be conversant with forensic science and to be prepared to challenge forensic science testimony – either through effective cross-examination or by marshaling expert testimony for the defense.

In this case, the scientific testimony at issue was not of the "individualization" variety, such as fingerprint, bite mark, or toolmark evidence.[17] Instead, the State presented a firearms expert who testified that Mr. Kendrick's rifle appeared to operate properly. Agent Fite performed "drop tests" designed to make the rifle misfire, but the rifle did not malfunction.

---

[16]DNA Exonerations Nationwide, Innocence Project, http://www.innocenceproject.org/Content/ DNA_Exonerations_Nationwide.php (last visited July 1, 2014); *see also* Sarah Lucy Cooper, *The Collision of Law and Science: American Court Responses to Developments in Forensic Science*, 33 Pace L. Rev. 234, 300 (2013).

[17]The goal of many forensic science methods is "individualization," which means using the unique markings on an object (markings such as fingerprints or toolmarks) to determine the source of those markings, to the exclusion of all other possible sources. *See NAS Report*, at 43-44.

Agent Fite concluded that no one could fire the rifle without pulling the trigger or breaking it.

Defense counsel employed two strategies to counteract this testimony. First, he tried to discredit Agent Fite by characterizing him as someone who believed he never made mistakes. Second, he attempted to cross-examine Agent Fite about the Remington Model 742 rifle, the precursor model to the rifle Mr. Kendrick owned. The trial court overruled this line of questioning as irrelevant and permitted Agent Fite to discuss only the Remington model that Mr. Kendrick owned.

At the post-conviction hearing, Mr. Kendrick presented Mr. Belk as a firearms expert. Like Agent Fite, Mr. Belk was unable to cause Mr. Kendrick's rifle to malfunction. However, Mr. Belk testified that the trigger mechanism – found in Mr. Kendrick's rifle and millions of other Remingtons of various types and models – had malfunctioned on occasion. The post-conviction court observed that Mr. Belk's testimony would have been "helpful" to Mr. Kendrick at trial.

The post-conviction court's observation that expert testimony regarding the occasional failure of the trigger mechanism would have been helpful at Mr. Kendrick's original trial comes with three significant qualifications. First, it is doubtful that Mr. Kendrick's trial counsel would have obtained permission to hire a firearms expert in 1994, even if he had requested one. It was not until 1995 that this Court recognized that indigent non-capital criminal defendants had a constitutional right to expert psychiatric assistance. *State v. Barnett*, 909 S.W.2d 423, 424 (Tenn. 1995). In doing so, we expressly limited the holding of the case to psychiatric experts. *State v. Barnett*, 909 S.W.2d at 430 n.7.

Second, even after briefing and oral argument in this case, it remains entirely uncertain that Mr. Kendrick's trial counsel could have located and hired a firearm expert in 1994 who could have testified concerning the potential defects of the Remington Model 7400's trigger mechanism.[18] Mr. Belk told the post-conviction court that he first testified about the trigger mechanism in 1994. The record does not indicate the existence of any other such experts who were available at that date. Mr. Kendrick's trial counsel said that he considered himself knowledgeable about firearms and that he was unaware of any discussion in the industry concerning defective Remington trigger mechanisms.

---

[18]The civil cases cited in Mr. Kendrick's supplemental reply brief all involved the Remington Model 700 rifle, not the Model 7400. In one of the cases, the United States Court of Appeals noted that the District Court had erred by admitting evidence regarding the trigger mechanism of the Remington Model 600 rifle. *Lewy v. Remington Arms Co.*, 836 F.2d 1104, 1109 (8th Cir. 1988).

Even though the public defender's office had often consulted a local gunsmith, Mr. Kendrick's trial counsel could not recall whether he or anyone else in the office talked to the gunsmith in conjunction with Mr. Kendrick's case. As trial counsel pointed out, "[Y]ou couldn't Google Remington trigger mechanisms back then." In short, the record does not contain clear and convincing evidence that trial counsel could have found Mr. Belk or his equivalent, or that the sort of testimony Mr. Belk provided at the post-conviction hearing would have been available or admissible at trial.

Third, even if Mr. Kendrick's trial counsel had been able to find and retain Mr. Belk for the original trial in 1994, Mr. Belk would not have been able to testify, as he did during the post-conviction hearing, about the three instances of the Remington Model 7400's malfunctioning. The record reflects that one, if not all, of these instances occurred, according to Mr. Belk, in the "late nineties, probably '97 or '98."

Even if we were to disregard these difficulties in Mr. Kendrick's argument, we are unable to conclude that Mr. Kendrick's trial counsel's performance was deficient. The best evidence that Mr. Kendrick's Model 7400 was capable of misfiring is the undisputed fact that Sergeant Miller was shot in the foot by the very same rifle. Sergeant Miller's injury was not speculative, and it did not involve other weapons. Trial counsel had a reasonable basis to believe Sergeant Miller would testify that he had not touched the trigger, and that this testimony would be "enough for a reasonable doubt as to anything."

In light of defense counsel's testimony, we find that Mr. Kendrick's trial counsel made a reasonable tactical decision to construct his "accidental firing" defense around Sergeant Miller's mishap with Mr. Kendrick's rifle. While counsel knew the substance of Agent Fite's impending testimony, defense counsel reasonably calculated that the incident involving Sergeant Miller would "trump[]" anything Agent Fite could say. In hindsight, Sergeant Miller's testimony deviated from what trial counsel expected. But at the time defense counsel was forming his trial strategy, it was reasonable to anticipate that he could "use [Sergeant Miller's testimony] very effectively" to elicit an acquittal. Despite Sergeant Miller's memory lapse, defense counsel's performance on this issue indicated "active and capable advocacy." *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 791. It was not constitutionally deficient.

This was not a case that hinged on expert testimony. The bulk of the State's case consisted of eyewitnesses. Although there are cases in which defense counsel must summon expert testimony – and we encourage defense attorneys to be vigilant in this regard – this is not such a case. Surely it would have been "best practices" for trial counsel to consult a firearms expert before trial, but in this case the failure to do so was not objectively unreasonable. *Harrington v. Richter*, 562 U.S. at ___, 131 S. Ct. at 788-89.

## VII.

The second basis for the Court of Criminal Appeals' decision that Mr. Kendrick's trial counsel's performance was deficient and prejudicial involved his failure to place before the jury hearsay evidence that would have benefitted his client. Specifically, the appellate court took Mr. Kendrick's trial counsel to task for not attempting to use the excited utterance exception to the hearsay rule to place before the jury the statements Sergeant Miller made to fellow officers after Mr. Kendrick's rifle shot him in the foot.

## A.

Officers Holbrook, Sims, and Gann each took statements from Sergeant Miller after he was wounded in the foot when Mr. Kendrick's rifle discharged. Had these officers related Sergeant Miller's statements to the jury at Mr. Kendrick's trial, these statements would have been hearsay because they were "statement[s], other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Here, the truth being asserted was the alleged fact that Sergeant Miller's finger was not on the trigger when Mr. Kendrick's rifle discharged. While hearsay statements are generally inadmissible, Tenn. R. Evid. 802, the Tennessee Rules of Evidence include several well-defined exceptions to Tenn. R. Evid. 802. *See* Tenn R. Evid. 803.

One exception to the hearsay rule involves excited utterances. Under Tenn. R. Evid. 803(2), "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule. The two-fold premise underlying this exception is (1) that shocking circumstances may produce a condition of excitement in a person which temporarily stills the person's capacity of reflection and produces utterances free of conscious fabrication, *State v. Gordon*, 952 S.W.2d 817, 819 (Tenn. 1997); Kenneth S. Braun, 2 *McCormick on Evidence* § 272, at 365 (7th ed. 2013) ("McCormick"), and (2) that excited utterances may be more accurate than much a later in-court description of the event because they are made when the memory of the event is fresh on the declarant's mind. *State v. Gordon*, 952 S.W.2d at 819-20; Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, *Tennessee Law of Evidence* § 807[2][a], at 8-85 (6th ed. 2013) ("Tennessee Law of Evidence").

Against this backdrop, this Court has developed a three-part test to determine the admissibility of an alleged excited utterance. All three prongs must be satisfied. *See generally* Tennessee Law of Evidence § 8.07[3], at 8-86 to 8-90.

First, there must be a startling event or condition. While "any event deemed startling" may be sufficient to meet this requirement, the event must be "sufficiently startling to

suspend the normal, reflective thought process of the declarant." The startling event need not be the act that gave rise to the legal controversy. Furthermore, "a subsequent startling event or condition which is related to the prior event" can also produce an excited utterance. *State v. Gordon*, 952 S.W.2d at 820.

The second broad requirement is that the statement must "relate to" the startling event or condition. A statement relates to the startling event when it describes all or part of the event or condition, or deals with the effect or impact of that event or condition. *State v. Stout*, 46 S.W.3d 689, 699 (Tenn. 2001); *see also State v. Gilley*, 297 S.W.3d 739, 761 (Tenn. Crim. App. 2008) ("[T]here must be a nexus between the statement and the startling event[.]").

The third requirement for admission of an excited utterance is that the statement must have been made "while the declarant is under the stress or excitement from the event or condition." The "ultimate test" under this prong is whether the statement suggests "spontaneity" and whether the statement has a "logical relation" to the shocking event. When "an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication," this prong may be satisfied. *State v. Gordon*, 952 S.W.2d at 820; *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993); *Garrison v. State*, 163 Tenn. 108, 116, 40 S.W.2d 1009, 1011 (1931).

One consideration for determining whether a statement was made under the stress and excitement of a shocking event is the time interval between the event and the statement. *Garrison v. State*, 40 S.W.2d at 1011. But the time interval is not dispositive; other factors must be considered. *State v. Gordon*, 952 S.W.2d at 820 & n.3; *see also State v. Stout*, 46 S.W.3d at 700. In addition to the time interval, other relevant circumstances include the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant (including such characteristics as age and physical or mental condition); and the contents of the statement itself, which may indicate the presence or absence of stress. *State v. Gordon*, 952 S.W.2d at 820.

The excited utterance exception carries a competency requirement. The declarant must have had an opportunity to observe the facts contained in the extrajudicial statement. *State v. Franklin*, 308 S.W.3d 799, 823 n.28 (Tenn. 2010); *State v. Land*, 34 S.W.3d 516, 529 (Tenn. Crim. App. 2000). This requirement is an extension of Tenn. R. Evid. 602, which states, "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony." Personal knowledge may be inferred from the statements themselves and the surrounding facts and

circumstances. *State v. Land*, 34 S.W.3d at 529. While "personal knowledge" does not require "absolute certainty" on the declarant's part, the declarant's statement may not be based on "mere speculation." *State v. Land*, 34 S.W.3d at 529.

The Tennessee Rules of Evidence do not require the declarant to be an actual participant in the precipitating event. *State v. Gordon*, 952 S.W.2d at 820. It is also worth noting that statements made in response to questions may be admissible as excited utterances if the declarant is still under the excitement or stress of the event during questioning. *State v. Gordon*, 952 S.W.2d at 820-21. On the other hand, other courts have observed that when a statement is made in response to an inquiry or when the statement is self-serving, these factors may show the statement was the result of reflective thought. *See* 2 McCormick § 272, at 370-72 & nn. 32-33.

The standard of review for rulings on hearsay evidence has multiple layers. Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. *State v. Gilley*, 297 S.W.3d at 759-61. Once the trial court has made its factual findings, the next questions – whether the facts prove that the statement (1) was hearsay and (2) fits under one the exceptions to the hearsay rule – are questions of law subject to de novo review. *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005).

If a statement is hearsay, but does not fit one of the exceptions, it is inadmissible, and the court must exclude the statement. But if a hearsay statement does fit under one of the exceptions, the trial court may not use the hearsay rule to suppress the statement. However, the statement may otherwise run afoul of another rule of evidence. *State v. Gilley*, 297 S.W.3d at 760-61. For example, a trial court may decline to admit an excited utterance if it finds the utterance lacks relevance under Tenn. R. Evid. 401 & 402 or if it finds the utterance's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. If a trial court excludes otherwise admissible hearsay on the basis of Rule 401, 402, or 403, this determination is reviewed for abuse of discretion. *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992); *State v. Gilley*, 297 S.W.3d at 759-61; *see also* 1 McCormick § 185, at 1010.

-35-

In this case, Mr. Kendrick's trial counsel did not attempt to introduce Sergeant Miller's statements as excited utterances. Accordingly, like the courts below, we have no trial court ruling to review. Both the trial court and the Court of Criminal Appeals approached the question of the admissibility of Sergeant Miller's statements as a question of law. Accordingly, we will address this question de novo.

For the purposes of this opinion, we will deem Sergeant Miller's statements to Officer Gann in the parking lot of the police service center and to Officer Holbrook in the hospital to be excited utterances. However, even if Sergeant Miller's statements were properly admissible under Tenn. R. Evid. 803(2), it does not necessarily follow that Mr. Kendrick's trial counsel was ineffective because he did not seek to admit them under Tenn. R. Evid. 803(2).

The question at this juncture is whether counsel's actions were objectively unreasonable under all the circumstances in light of the professional norms that prevailed in 1994. *Strickland v. Washington*, 466 U.S. at 688. We must undertake this analysis with the presumption that counsel's representation was adequate, and we must also do our best to eliminate the distorting effects of hindsight. *Mobley v. State*, 397 S.W.3d at 80-81.

Mr. Kendrick's trial counsel candidly admitted at the post-conviction hearing that it did not occur to him during the heat of the trial to attempt to introduce Sergeant Miller's statements to the other officers as excited utterances under Tenn. R. Evid. 803(2). While lack of familiarity with relevant court rules might in some cases provide grounds for a finding of ineffective assistance of counsel, this record reflects that Mr. Kendrick's trial counsel labored to convince the jury that Sergeant Miller's finger was not on the trigger of the rifle when it fired into his foot.

Counsel closely cross-examined Sergeant Miller regarding the incident and his loss of memory of the particulars. He also recalled Sergeant Miller to the stand and attempted to refresh his memory with the incident reports. Counsel attempted to use the incidents reports as impeachment evidence in accordance with Tenn. R. Evid. 613(b).[19] In addition, he pointed out during his cross-examination of Sergeant Miller and his closing argument, that when Sergeant Miller demonstrated how he was holding the rifle, his finger was not near the

---

[19]The Court of Criminal Appeals found that the trial court erred by preventing Mr. Kendrick's trial counsel from impeaching Sergeant Miller based on his prior inconsistent statements. *State v. Kendricks*, 947 S.W.2d at 881-82. Mr. Kendrick's trial counsel pursued a proper basis for the admission of the reports and failed only because of the trial court's error.

trigger and that Sergeant Miller stated during cross-examination that he was holding the rifle in the courtroom in the same way he was holding it when he was shot. Finally, during his cross-examination of Sergeant Miller about his training and experience with firearms, Mr. Kendrick's trial counsel elicited answers strongly suggesting that Sergeant Miller would not have picked up the rifle with his finger on the trigger.

In short, trial counsel did almost everything at his disposal to prove that Sergeant Miller had not pulled the trigger, with the exception that he did not offer the statements as substantive evidence under Tenn. R. Evid. 803(2). As the Court of Criminal Appeals noted on direct appeal, counsel's "thorough cross-examination of Officer Miller . . . provided the jury ample evidence from which it could have concluded that Officer Miller's memory was faulty and that he knew he had not caused the gun to fire by pulling the trigger." *State v. Kendricks*, 947 S.W.2d at 882.

The "circumstances" surrounding this evidentiary issue reflect that Mr. Kendrick's trial counsel adduced evidence that would have supported the jury's conclusion that Sergeant Miller was not touching the trigger when Mr. Kendrick's rifle discharged into his foot. The fact that counsel failed to go one step further by pursuing the excited utterance exception does not overcome the presumption that trial counsel gave Mr. Kendrick adequate representation. Although the excited utterance exception slipped his mind, trial counsel took great pains to inform the jury that the weapon apparently misfired for Sergeant Miller. This was the best evidence that the trigger mechanism on Mr. Kendrick's rifle might have been defective. Counsel's representation was not deficient in this regard.

Even if we determined that trial counsel's representation was deficient, the other "ample evidence" summarized above would mitigate against finding that Mr. Kendrick was prejudiced. The defense theory was that the rifle malfunctioned both for Mr. Kendrick and Sergeant Miller. The jury heard evidence to support that theory, including Sergeant Miller's cross-examination and Mr. Kendrick's statement that he was "almost positive" his finger was not on the trigger. However, the jury also heard evidence suggesting that Mr. Kendrick pulled the trigger. Mr. Benton testified that he saw Mr. Kendrick's "right hand was on the pistol grip area around the trigger and the left hand was up near the stock." Other evidence suggested a premeditated murder, including Mr. Kendrick's flight from the scene, his failure to give or ask for assistance, the fact that he discarded the weapon, and the testimony of his daughter and Mr. Shepheard. The fact that the jury was not able to see or hear the incident reports does not, by itself, undermine our confidence in the verdict. *See Strickland v. Washington*, 466 U.S. at 694.

## VIII.

We conclude that Mr. Kendrick did not receive ineffective assistance from his trial counsel with regard to the two issues before the Court on this appeal. Accordingly, the judgment of the Court of Criminal Appeals is reversed. In light of the fact that the appellate court did not consider the remaining issues raised by Mr. Kendrick, we remand this case to the Court of Criminal Appeals with directions to consider the issues that it pretermitted in its earlier decision. Because Mr. Kendrick appears indigent, we assess the costs of this appeal to the State of Tennessee.

_____
WILLIAM C. KOCH, JR., JUSTICE