FILED

03/10/2025

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 1, 2024 Session

## STATE OF TENNESSEE v. JASMIN MOORE

**Appeal from the Criminal Court for Shelby County
Nos. C1904369, 19-02836  Chris Craft, Judge**

_____

### No. W2023-01500-CCA-R3-CD
_____

The Defendant, Jasmin Moore, was convicted by a Shelby County Criminal Court jury of first degree felony murder in the perpetration of or attempt to perpetrate a robbery and of especially aggravated robbery, a Class A felony.  *See* T.C.A. §§ 39-13-202(a)(2) (2018) (subsequently amended) (first degree felony murder), 39-13-403 (2018) (especially aggravated robbery).  The trial court imposed a life sentence for the first degree murder conviction and a concurrent sentence of sixteen years for the especially aggravated robbery conviction.  On appeal, the Defendant contends that:  (1) the trial court erred in denying her motion to dismiss based upon an alleged violation of her right to a speedy trial, (2) the court erred in several evidentiary rulings, (3) the court erred in denying her request for a jury instruction regarding unavailable evidence, (4) the court erred in permitting police recruits to attend the trial, and (5) she should receive a new trial due to the cumulative effect of the alleged trial errors.  We affirm the judgments of the criminal court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and MATTHEW J. WILSON, JJ., joined.

Benjamin Israel, Memphis, Tennessee, for the appellant, Jasmin Moore.

Jonathan Skrmetti, Attorney General and Reporter; Brooke A. Huppenthal, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Melanie Headley and Jose Leon, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

The Defendant's convictions arose from the December 2, 2018 robbery and homicide of Palmer Cowley. The Defendant was charged with codefendants Jerrod Williams and Travis Wilkerson, and she was tried separately. The State's theory at the trial was that the Defendant, who was using drugs with the victim, gave one of the codefendants the victim's address in order for the codefendant to come to the address and rob the victim. During the ensuing incident at the victim's apartment, one of the codefendants fatally shot the victim.

At the trial, the evidence showed that the Defendant met the victim earlier the same day and used drugs with him at his apartment after purchasing crack cocaine at a "drug house." Codefendants Williams and Wilkerson were present at the drug house and sold drugs that day. Initially, the Defendant purchased drugs from another man, "Sammy." Later, when she and the victim returned to the drug house to buy more crack cocaine, she purchased from codefendant Williams. During their travels to and from the drug house, the victim visited an ATM and withdrew cash in the Defendant's presence. At the end of the last drug transaction between the Defendant and Williams, they spoke for a few minutes, and Williams walked her outside. The Defendant and the victim returned to the victim's apartment, where they used the drugs and drank beer.

Codefendant Wilkerson testified at the trial that, after the Defendant's conversation with codefendant Williams, Williams asked Wilkerson to go from the drug house to a location in East Memphis to "serve" some drugs, meaning to sell drugs. Wilkerson said Williams wanted Wilkerson to go with him because Wilkerson was familiar with East Memphis, but Williams was not. Wilkerson agreed, and they traveled in a white SUV driven by Williams. Wilkerson denied any knowledge that they planned to rob someone. Wilkerson said that Williams received a text message from "Food Stamp Buyer," which contained an address. Wilkerson showed Williams how to enter the address into Williams's GPS to navigate to the location, which took them to the victim's apartment complex. Wilkerson accompanied Williams to the victim's apartment, and he stayed outside while Williams entered, ostensibly to "serve" the drugs. After some time, Wilkerson became concerned about the length of time Williams had been in the apartment, and knocked on the door. Williams answered the door and told Wilkerson to come inside. Williams tried to get Wilkerson to take a television that was in the apartment, but Wilkerson objected that he had not come to do any "work." Wilkerson said that Williams stated the victim had not paid Williams but that the victim insisted he had paid. Wilkerson said he saw the victim lying on his stomach on the floor, the naked Defendant lying on top of the victim and holding the victim with her arms, and Williams holding a handgun. Wilkerson said Williams took a debit card from his pocket, told Wilkerson a PIN for the card, and instructed him to go to an ATM to get $200 and to return. Wilkerson claimed the $200

was to be his compensation for his helping Williams locate the victim's apartment. Wilkerson said he left the apartment and went to an ATM, but the card did not work. While he was on this errand, a cell phone inside Williams's SUV rang, and the display showed that the caller was "Food Stamp Buyer." Wilkerson answered the call, and he identified Williams as the caller. Wilkerson said Williams told him to return to the apartment complex to pick him up. Wilkerson returned, and he encountered Williams hiding in the bushes at the complex's entrance and wearing different clothing than he had worn earlier. Wilkerson said Williams held a gun and stated that he shot the victim. Wilkerson also claimed that Williams said the Defendant bound the victim and that she and Williams had searched the apartment for "whatever they supposed to been looking for." Wilkerson said Williams claimed he shot twice, first striking a wall and then hitting the victim. Wilkerson said that when he asked where the Defendant was, Williams claimed she was cleaning the crime scene and wiping it to remove fingerprints. Wilkerson said they returned to the drug house, where Wilkerson returned the debit card to Williams, who told Wilkerson that he had taken the debit card from the victim.

The victim lay on the ground outside the apartment when the police arrived. A neighbor was with the victim. The victim made statements to the neighbor and on a police body camera recording which implicated the Defendant. The victim told the neighbor that he was dying and that "the b---- set me up." He said on the body camera recording that the Defendant let the intruders into his apartment and that she acted as if she did not know the intruders, but she did. The victim died from a gunshot wound to the torso, and blunt force injuries to his head were also noted on the autopsy report. The pathologist who performed the autopsy classified the manner of death as homicide.

According to the Defendant's trial testimony, she met the victim at a gas station and went with him to purchase and use drugs. She entered the drug house, and the victim stayed in his car. She said they went to the drug house to purchase drugs two or three times. She said that, at one point, the victim left his apartment to take beer to his neighbor. She denied that she called anyone or sent text messages while the victim was gone. She said that during the evening, she went into the victim's bathroom to bathe and heard a "commotion" while she was in the bathroom. When she opened the bathroom door to investigate, she was hit in the face by an unknown person with a gun. An intruder dragged her from the bathroom and placed her face down on the floor. She heard people yelling at the victim for money and the victim's protestations that he had no money. She said an intruder removed her to a bedroom, where she remained as she heard one or two gunshots.

The Defendant testified that she did not see the intruders' faces. She claimed she did not have a cell phone on the night of the shooting, but she acknowledged that she told an investigator that she "may have called" Williams that night. She said she fled the apartment naked, leaving the dying victim on the ground outside as she ran away. She said

- 3 -

she ran from the complex, flagged down a passing car, and went to Cleveland, Ohio, where she was arrested months later. She acknowledged that she never contacted authorities about the shooting, either on the night it occurred or after she reached Cleveland. The Defendant denied that she participated in a scheme to rob the victim but acknowledged buying drugs from and speaking with Williams on the night of the shooting.

The jury credited that State's proof and convicted the Defendant. After the trial court imposed an effective life sentence and denied the Defendant's motion for a new trial, this appeal followed.

# I

## SPEEDY TRIAL

The Defendant contends that she was denied her constitutional right to a speedy trial and that the trial court erred in failing to dismiss the case due to an unreasonable delay. The State responds that "sufficient reasons necessitated the delay," that the Defendant was not prejudiced by the delay, and that court did not err in denying the motion to dismiss due to pretrial delay. We agree with the State.

The United States and Tennessee Constitutions guarantee a criminal defendant the right to a speedy trial. U.S. Const. amend. VI; Tenn. Const. art. 1, § 9. In addition, the right to a speedy trial is guaranteed by statute in Tennessee. *See* T.C.A. § 40-14-101 (2018). The purpose of the right to a speedy trial is to protect a defendant from harm caused by "oppressive pretrial incarceration, anxiety and concern . . ., and the possibility that the accused's defense will be impaired by dimming memories and loss of exculpatory evidence." *Doggett v. U.S.*, 505 U.S. 647, 654 (1992) (internal quotations marks and citations omitted); *see State v. Utley*, 956 S.W.2d 489, 492 (Tenn. 1997). In determining whether a defendant's right to a speedy trial has been violated, this court considers the length and reasons for the delay, whether a defendant asserted the right, and whether a defendant was prejudiced by the delay. *State v. Bishop*, 493 S.W.2d 81, 83-84 (Tenn. 1973) (adopting the analysis enunciated in *Barker v. Wingo*, 407 U.S. 514 (1972)).

A claim that a defendant has been denied the right to a speedy trial involves a mixed question of law and fact. *State v. Moon*, 644 S.W.3d 72, 78 (Tenn. 2022). We conduct a de novo review of a trial court's interpretation and application of the law. *Id*. We afford deference to the trial court's factual findings unless the evidence preponderates against the findings. *Id.*

- 4 -

An examination of the timing of relevant events is apt: The Defendant's crimes occurred on December 2, 2018. The grand jury indicted her, along with her codefendants, on April 18, 2019. She was arrested in Ohio on June 27, 2019. She was transferred to Tennessee custody, where she remained during the pendency of her case. At some point, codefendant Wilkerson agreed to testify as a State's witness, and his case was severed from that of the Defendant and codefendant Williams. On March 13, 2020, the Tennessee Supreme Court suspended in-person court proceedings, which included jury trials, subject to certain exceptions not relevant here. *See In re COVID-19 Pandemic*, No. ADM2020-00428 (Tenn. Mar. 13, 2020) (order). On May 8, 2020, the Defendant, who was represented by counsel, filed pro se motions to dismiss due to the delay in bringing her to trial and to sever her case from that of her codefendants. The supreme court lifted the suspension of jury trials, effective following the close of business on March 31, 2021, and subject to the terms of the comprehensive written plan promulgated in each local judicial district for in-person proceedings. *See In re COVID-19 Pandemic*, No. ADM2020-0428 (Tenn. Feb. 12, 2021) (order).

In May 2021, a question arose regarding codefendant Williams's competency in a federal proceeding. In November 2021, a "competency report" was created for Williams "in the federal system." The report stated that Williams was not competent to stand trial and that he should undergo competency training. On December 1, 2021, the present case was set for trial on September 19, 2022. Through counsel, the Defendant asserted her right to a speedy trial on December 22, 2021.

In August 2022, the defense filed a motion requesting a hearing to determine codefendant Williams's competence to testify, alleging that Williams had a pending motion for an examination to determine his competency to stand trial. Because the State sought to try the Defendant and Williams jointly, the State moved for a continuance. The State also based its continuance motion on the departure of an assistant district attorney general who had been assigned to the case. The State maintained that it wanted to try the Defendant and codefendant Williams jointly. The defense opposed the continuance and requested to go forward as planned on the scheduled trial date. The trial court made the following findings relative to the delay:

> [J]ust so the record's clear, we couldn't try a case for a couple of years because of the pandemic. We couldn't get jurors in the building. But then on . . .December the lst, 2021, this . . . case was set for trial today. . . . December the lst, 2021, we started allowing jury trials in the building again, because the pandemic was down. So we set it for trial September the 19th, 2022, which is next month.

- 5 -

The court granted the continuance, set the case for trial on October 10, 2022, and set a September 19, 2022 hearing date regarding Williams's competency, stating that it would rule on whether a severance was necessary after determining the status of Williams's competency.

At the September 19 hearing, Williams's counsel stated that Williams was still awaiting competency training in the federal system, that the issue of his competency had not yet been adjudicated by a federal judge, and that he had not been evaluated by State competency experts. Williams's counsel stated that federal authorities had determined that Williams's IQ was 44 and that she "would imagine that the possibility of restoring his competency isn't likely." The trial court found that continuing to hold the Defendant in jail indefinitely would be unconstitutional, given the dim prospect that Williams's competency could be established, and that a trial date should be set. The court ruled that the case would go to trial without codefendant Williams if his competency had not been established. An assistant district attorney noted a conflict with the previously scheduled trial date of October 10, 2022, and the court set the trial date as March 27, 2023. When the defense objected to the March 2023 date, the court stated the following to support the date selected, "[W]e have a new D.A., we have half the staff in here and the prosecutors have left and everything is crazy right now, as far as personnel and we need to get her case tried, but we need to make sure that everybody is here and she has a fair trial and everybody is here that's needed." Defense counsel stated that he planned to file a motion to dismiss due to unreasonable delay and asked that the assistant district attorney state on the record the basis for the objection to the October 10, 2022 trial date. The assistant district attorney stated that he "had a personal matter to attend to" and declined to elaborate further, although information developed at a later hearing showed that he had, months earlier, requested annual leave during this time, which coincided with his children's school break.

On September 21, 2022, the defense filed a motion to dismiss due to the delay. The trial court conducted a hearing on November 8, 2022, and it denied the motion on January 9, 2023. In its order denying the motion, the court recited the dates related to suspension of in-court proceedings due to the COVID-19 pandemic and noted that, during the pandemic, "[T]he Shelby County Health Department would not allow jurors to enter the Criminal Justice Complex at 201 Poplar in Memphis, the courthouse which contained the Shelby County Criminal Courts." The court went on to make the following findings relative to the case's procedural history:

> This court requested and received the permission of the Chief Justice to try two jury trials during this time [before March 31, 2021] which had been set for trial previously during the Covid-19 suspension but had been prevented from being tried. No such request was made by the defense in the instant case, however. Subsequent to March 31, 2021, after the suspension was

- 6 -

lifted, the defendant's case was reset eleven additional times, and on December 1, 2021, this court conditionally set the defendant's case for trial September 19, 2022. There were three reasons this court did not set the defendant's trial sooner. The first was because the courts had a large backlog of homicides and Class A and B felonies already pending trial due to this court's not being allowed to try cases of inmates in custody due to the Supreme Court's prohibition, for almost two years. Secondly, this court had to accommodate the attorneys' trial schedules for other trials they had already set in Shelby County. The third and main reason, however, was that the State was not agreeing to sever the defendant's trial from that of Jerrod Williams, her codefendant, represented by the Public Defender, because at the time the case was first set for trial his competency was questionable, and he was undergoing "competency training." This court therefore set the trial date conditionally, hoping that he would become competent to stand trial in September. Ms. Moore's attorney continued to investigate the case up until the September trial date, making good use of the 9 months prior to trial, and this court entered ex parte orders for funds for two additional investigations in August of 2022, the month before the trial was set.

The Defendant filed an application for permission to appeal pursue an interlocutory appeal pursuant to Tennessee Rule of Appellate Procedure 9 with the trial court, but the record does not reflect the court's ruling. The records of this court reflect no filing of a Rule 9 application. The case proceeded to trial on March 27, 2023, and the guilty verdicts were returned on April 1, 2023.

On appeal, the Defendant argues that the trial court erred in its analysis of the *Barker* factors, all of which she argues favored dismissal. She urges this court to reverse the trial court, vacate her convictions, and dismiss the case due to the State's unreasonable delay, resulting in an unconstitutional denial of her right to a speedy trial.

The trial court made the following findings addressing the first *Barker* factor:

The length of the delay is the first element which the court must consider. [*State v. Simmons*, 54 S.W.3d 755, 759 (Tenn. 2001) (applying the *Barker* factors)]. Unless a "presumptively prejudicial" delay has occurred, inquiry into the remaining factors is not necessary. *Id.* (citation omitted). A delay of one year generally will be considered sufficient to trigger analysis of the remaining three factors, but the nature and complexity of the case impact the reasonableness of the length. *Id.* "[T]he presumption that delay has prejudiced the accused intensifies over time[,]" however. *Id.* In this case, the capias issued pursuant to the indictment was served on the defendant June

27, 2019, placing her under arrest, so clearly more than one year has passed, or a total of three years and nine months until the future May 27, 2023 trial in four months, creating presumptive prejudice, so that the other three factors must now be considered.

The record supports the trial court's determination. Inquiry into the remaining *Barker* factors was justified.

Addressing the second factor, the trial court found:

Regarding the second *Barker* factor, reason for delay, the Tennessee Supreme Court has noted that for purposes of speedy trial analysis, trial delays can be categorized as follows: (a) Intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (b) Bureaucratic indifference or negligence; (c) Delay necessary to the fair and effective prosecution of the case; and (d) Delay caused, or acquiesced in, by the defense. *State v. Wood*, 924 S.W.2d 342, 346-47 (Tenn. 1996). In this case, the first time the defense requested a trial was December 1, 2021, after the defendant had been in custody for 2 ½ years. Until that time, the defendant changed attorneys by retained private counsel, obtained funds from this court on ex parte requests for investigative services, and required numerous resets. The first two years the defendant was in custody, the pandemic kept either side from being able to ask for a jury trial. There was never any suggestion of intentional delay to gain a tactical advantage over the defense, delay designed to harass the defendant or any hint of bureaucratic indifference or negligence. This court finds that the sudden loss of staff by the District Attorney, including the chief prosecutor for the trial, the month before the first trial setting was not bureaucratic indifference. The Shelby County District Attorney, Amy Weirich, lost the election the month before trial, clearly not her intent. That was a matter clearly out of the control of the prosecutors. This court also finds that some of the delay caused by competency training needed to try the co-defendant, Jerrod Williams, was delay necessary to the fair and effective prosecution of the case by the State. This factor favors the State's position.

The Defendant argues that the trial court erred in weighing this factor in the State's favor. She argues that the State intentionally delayed the trial, which the court should have weighed heavily against the State. The Defendant points to the State's preference to try her and Williams together, even in the face of the elapsed time and the question of Williams's competency. She characterizes the State's justifications for the delay as "disingenuous." She argues that, in August 2022 when the first trial date approached, the

- 8 -

State "invented a reason to request a continuance" and that the State failed to make diligent efforts to obtain the presence of Williams, who was in federal custody in another state. The court rejected the notion that the delay had been intentional, noting the many challenges occasioned by the closure of the courts for in-person proceedings due to the COVID-19 pandemic, significant personnel changes in the district attorney general's office, and the uncertainty about Williams's competency. The record does not preponderate against the court's findings that the delay had not been an intentional effort to gain a tactical advantage, for the purpose of harassing the Defendant, or due to bureaucratic indifference or negligence. Rather, the record shows that the prosecution was plagued largely by external complicating factors. The court did not err in weighing this factor in the State's favor.

Next, the trial court found:

> The third factor, the defendant's assertion of the right, does not figure against the State. On December 1, 2021, this court had already conditionally set the defendant's case for trial after she had been in custody 2 ½ years, with consent of all parties, three weeks prior to her Request for Speedy Trial having been filed.

The Defendant argues that the trial court erred in weighing this factor in the State's favor because the court essentially excused the delay of over two years before the speedy trial demand was filed by noting that the case had been set for trial before the demand was filed. She also argues that the court "ignored" the delay between the initial and actual trial dates. She complains that the court "reiterated its analysis of factor one [regarding the length of the delay]."

The Defendant demanded a speedy trial after she had been in custody for two and one-half years, much of it during the pandemic. Her case was already set for trial at this point. During the suspension of in-court proceedings, she did not request a waiver from the Tennessee Supreme Court to allow her trial to go forward. "[F]ailure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker*, 407 U.S. at 532; *State v. Christopher Bolden*, No. W2022-01127-CCA-R3-CD, 2024 WL 466168, at *15 (Tenn. Crim. App. Feb. 7, 2024) ("Because Defendant did not assert his right to a speedy trial until over fifteen months after his arrest and because the further delays in his trial were primarily the result of the COVID-19 global pandemic, we conclude that [the third *Barker* factor] weighs only slightly in favor of Defendant."), *perm. app. denied* (Tenn. Sept. 12, 2024).

Upon de novo review, we conclude that the trial court improperly determined that the factor for assertion of the speedy trial right "does not figure against the State." The record reflects that the Defendant asserted the right to a speedy trial, albeit belatedly, two

- 9 -

and one-half years after her arrest. We conclude that this factor weighs slightly in the Defendant's favor.

In evaluating whether the Defendant was prejudiced by the delay, the trial court found:

> The fourth and final *Barker* factor, prejudice, has been described by the Tennessee Supreme Court as "the single most important factor in the balancing test." *State v. Baker*, 614 S.W.2d 352, 356 (Tenn. 1981). The Court noted that "the most serious [of these interests] is the last, because the inability of a defendant adequately to prepare [her] case skews the fairness of the entire system." *Barker*, 407 U.S. at 532. No prejudice has been shown by the defense due to any delay. The only change alleged by the defense due to the lapse of time before trial was that a first responder in this case has died. However, the defense stated that the body camera recording made by the officer is available that recorded the statements of the deceased victim. This court has not seen this recording, as no motions have ever been heard during the pendency of this case other than the instant motion to dismiss, but no showing has been made that the testimony of this officer would have been of any particular help to the defense.

> The court finds that the defendant was arrested after the Supreme Court's Covid-19 order had gone into effect, the defendant changed attorneys, this case was set for trial as a tentative date as soon as the new attorney was ready and it was requested, conditioned on the co-defendant's competency training, and due to the lead prosecutor's leaving the DA's office three weeks before trial and the co-defendant's never being returned from the Federal authorities, this court granted a severance against the wishes of the State and reset the trial at the absolute soonest date it could set it under the circumstances, with no prejudice to the defense, thereby insured a fair trial for both sides. After having considered the *Barker v. Wingo* factors, this court finds that there has been no unconstitutional delay, and that the indictment against Ms. Moore should not be dismissed. There has also been no showing thus far that the resetting of the trial from September 19, 2022 to March 27, 2023, other than keeping the defendant in pretrial custody an extra 6 months, has caused any prejudice to the defense.

The Defendant argues that the trial court erred in concluding that she was not prejudiced by the delay because she demonstrated actual prejudice. Three interests are protected by the fourth *Barker* factor: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the

defense will be impaired." *See Barker*, 407 U.S. at 532. In her brief, the Defendant claims that she suffered ongoing anxiety and concern because she had two young children in Ohio whom she was unable to see for years. She claims that this anxiety and concern impaired her ability to prepare for trial and to testify effectively. The fault with this argument is that it relies on statements of counsel to establish facts which are otherwise outside the record. At the hearings related to this issue, no evidence was presented which addressed prejudice due to delay because of the Defendant's family situation or any attendant anxiety and concern which impaired her ability to prepare for and participate in the trial. *See State v. Wilcoxson*, 772 S.W.2d 33, 36-37 (Tenn. 1989) (in analyzing a speedy trial claim, noting the lack of proof in the record to support the defendant's claim of prejudice due to his pretrial incarceration). Likewise, the Defendant does not assert on appeal that she was otherwise unable to prepare for and proceed with the trial due to the delay.

Based upon the record before us, the prosecution of the Defendant was delayed due to several factors: lengthy court closures due to the COVID-19 pandemic after the Defendant's arrest and the resulting backlogs, significant personnel changes in the district attorney general's office, and the unresolved question of codefendant Williams's competency. After the Defendant asserted her right to a speedy trial, the trial court made a prompt inquiry into the delay, and it ultimately severed the Defendant's case for trial and set a trial date as soon as was feasible under the circumstances. It is undisputed that a delay occurred. The court concluded that it was inevitable under the circumstances and that it did not result in prejudice to the Defendant, aside from approximately six months of additional pretrial incarceration. Although we acknowledge that additional incarceration cannot be discounted entirely, the record supports the court's determination on the facts of this case.

We conclude that the trial court did not err in denying the motion to dismiss on the basis of a denial of the Defendant's right to a speedy trial. The Defendant is not entitled to relief on this basis.

## II

## EVIDENTIARY RULINGS

The Defendant has raised several issues related to the trial court's evidentiary rulings. Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the

jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Questions regarding the admissibility and relevance of evidence, aside from matters involving hearsay evidence, generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006).

In contrast to the abuse of discretion standard we employ for most evidentiary questions, we employ a de novo standard for issues related to hearsay evidence. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible unless it qualifies as an exception. *Id.* at 802. A trial court's factual findings and credibility determinations relative to a hearsay issue are binding upon an appellate court unless the evidence preponderates against them. *Kendrick*, 454 S.W.3d at 479. The determination of whether the statement in question is hearsay and whether a hearsay exception applies are questions of law that are reviewed de novo. *Id.*

### A. Victim's Statements

The Defendant contends that the trial court erred in admitting evidence of the victim's statements as he lay on the ground outside his apartment after being shot. The victim's neighbor testified as a State's witness that, as the victim lay wounded on the ground outside his apartment, he told her that he was dying and that "the b--- set me up." The court also admitted police body camera footage during the State's case-in-chief which captured the victim's statement to responding officers that the Defendant pretended she did not know the intruders "but she did." The Defendant argues that the victim's statements were inadmissible lay opinion testimony which were barred by Tennessee Rule of Evidence 701. She does not argue that they were inadmissible hearsay.

Without question, the victim's statements were relevant to the question of whether the Defendant was culpable for the robbery and homicide. *See* Tenn. R. Evid. 401, 402. The victim's out-of-court statements were hearsay because they were offered for their truth, that the Defendant was culpable in the robbery and shooting. *See id.* at 801(c), 802. Thus, we consider their initial admissibility via the hearsay rules with a de novo standard of review. *See Kendrick*, 454 S.W.3d at 479. If the statements are not barred by the hearsay

rules, their admissibility as lay opinion testimony is subject to review for abuse of discretion. *See id.*

Because the victim's statements were hearsay, they were inadmissible unless they qualify as a hearsay exception. *See* Tenn. R. Evid. 803, 804. The trial court found that the victim's statements were admissible pursuant to the hearsay exception for excited utterances, and the Defendant does not claim that the court erred in these determinations. *See id.* at 803(2); *Kendrick*, 454 S.W.3d at 479.

Although the victim's statements were admissible hearsay, the remaining question is whether the statements were inadmissible because they were lay opinion testimony. As relevant here, Tennessee Rule of Evidence 701 provides:

> (a) Generally. – If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are
>
> (1) rationally based on the perception of the witness and
>
> (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Tenn. R. Evid. 701(a).

The victim's statements were rationally based upon his perception. Regarding whether the evidence was helpful to the determination of facts in issue, the evidence was highly probative of whether the Defendant was a culpable participant in the criminal activity. The Defendant quibbles with the reliability of the evidence, arguing that the statements "were not rationally based on the [victim's] observations" and that they invited speculation. The Defendant argues that "[i]t was not at all clear" how the victim determined that the Defendant knew the intruders. The jury received evidence about the facts of the incident that formed the basis for the victim's opinions. In addition, the victim was able to observe the Defendant's actions and demeanor during the incident, and the victim's impressions based upon those observations were relevant and probative. The jury heard a body camera recording of the victim's statements, in which he said the Defendant opened the door for the intruders. Codefendant Wilkerson testified that the Defendant lay on top of the victim and later bound him. The jury was charged with weighing the evidence as it deemed appropriate in light of all of the proof presented. Upon review, we conclude that the trial court did not abuse its discretion in admitting the victim's lay opinion testimony. *See Kendrick*, 454 S.W.3d at 479.

## B. Codefendant Wilkerson's Upcoming Court Date and Incentive to Testify

The Defendant contends that the trial court abused its discretion in excluding evidence that codefendant Wilkerson had a court date in his own case one week after his testimony at the Defendant's trial. She argues that this evidence was relevant and probative to show that Wilkerson had an incentive to testify in a way that favored the State in order to advance his own interests. The State responds that no abuse of discretion has been shown.

At the trial, the defense sought to introduce "a certain crime record"[1] to show that codefendant Wilkerson had an upcoming court date, on the basis that it was relevant to show "Wilkerson was expecting leniency from the State." The defense raised this issue during its case-in-chief after the Defendant testified. The trial court found that it had set the court date after the Defendant's trial in order to prevent the Defendant and Wilkerson from "meet[ing] in lockup" and that the evidence was not relevant and therefore inadmissible.

At the hearing on the motion for a new trial, the defense presented the testimony of three criminal defense attorneys. One attorney testified that the State never made a plea offer to a testifying codefendant until after the codefendant testified but that, in such cases, a "deal to make a deal" existed. A second attorney testified that she had represented seven testifying codefendants, each of whom received a favorable plea offer after testifying. Codefendant Wilkerson's attorney testified that, in his experience, the State never made a plea offer before a testifying codefendant had testified. He said that he and Wilkerson met with prosecutors to discuss the potential content of Wilkerson's testimony at the Defendant's trial. He said that it was "not unusual" for a testifying codefendant to return to court quickly after their testimony, but he said no plea offer had yet been extended to Wilkerson, even though six months had passed since Wilkerson's testimony at the Defendant's trial.

The Defendant acknowledges in her brief that the probative value of the evidence was limited, but she argues that it was relevant and admissible. She claims that its exclusion was prejudicial because it hindered the jury's understanding of the "deal to make a deal" that existed. She makes a brief Confrontation Clause argument relative to "the right to inquire about any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness." *See State v. Sayles*, 49 S.W.3d 275, 279 (Tenn. 2001).

---

[1] On appeal, the Defendant argues that this was "the court jacket." The document has not been included in the appellate record, which the Defendant concedes in her brief.

Codefendant Wilkerson testified that at the trial he was cooperating with the State without a deal or any promises. The defense had the opportunity, on cross-examination, to question Wilkerson about any hopes, expectations, or assurances relative to a plea offer. The trial court concluded that no probative value of the "certain crime record" referencing Wilkerson's upcoming court date had been shown. Upon review, we conclude that the trial court did not abuse its discretion in excluding the evidence. The defense had the opportunity to cross-examine Wilkerson about the existence of any agreement and any favorable treatment and was thus afforded the right to confront the witness. The mere existence of a court date lacked probative value relative to the issues on trial.

### C. Codefendant Williams's possession of a Pellet Gun

The Defendant contends that the trial court erred in excluding evidence that codefendant Williams had possessed a pellet gun during a police encounter in 2009, nine years before the crimes in this case. The Defendant argues that a pellet gun found in the bedroom where the Defendant claimed to have been confined during the incident was similar to the pellet gun depicted in a photograph from the 2009 police encounter. The Defendant argues that she should have been permitted to introduce the evidence of Williams's prior pellet gun possession to show that the pellet gun found in the bedroom "probably belonged to" Williams. She claims that this evidence was necessary "to contest the spurious implication that she possessed the pellet gun found at the scene." The State argues that the trial court did not abuse its discretion in excluding the evidence because the police report containing the information was hearsay and the evidence did not address a fact of consequence, given that the victim was killed by a gunshot from a .40-caliber gun, not a pellet gun.

The relevance of codefendant Williams's possession of a similar pellet gun some nine years before the offenses in the present case is tenuous, at best. *See* Tenn. R. Evid. 401, 402. In any event, the defense did not attempt to call the officer who created the report, and information in a police report is not an exception to the rule excluding hearsay. *See id.* at 802, 803. The Defendant has not argued that another hearsay exception applied, nor did she seek to introduce this evidence through other, potentially admissible means. The trial court did not abuse its discretion in excluding the evidence.

### D. The Victim's Status as a Disabled Veteran

The Defendant contends that the trial court abused its discretion in allowing the State to "repeatedly emphasize" that the victim was a disabled veteran, rather than to show the source of his income. She argues that the victim's status as a disabled veteran was irrelevant and that its admission was unfairly prejudicial. *See id.* at 401, 402, 403. The

State responds that the Defendant has waived this issue because she did not object to this testimony on the basis of its relevance and did not object to the State's closing argument that the victim was a disabled veteran. The State contends that relief as a matter of plain error, which the Defendant has not requested, is not required. The Defendant has not responded to the State's waiver argument.

The State's proof included testimony that the victim had recently received a large payment and had purchased a car and that he received a monthly disabled veteran payment. The neighbor also testified that the victim was "flashy" and "liked to entertain women" when he received money from his disability benefits. The neighbor said she saw the victim with a woman on the date of the crimes. The defense did not object to these statements. A second neighbor testified that the victim had told her that he was "waiting on a check from the VA" and that she knew he had been "injured in the service." The defense objected to this witness's providing "a long narrative" describing the victim's character. The trial court ruled that the victim's having served in the military was hearsay evidence, and the court then clarified by asking the witness if she had served in the military with the victim or had received this information about his military service when someone told her about it. The court then instructed the witness that she could not testify about what someone else told her. During cross-examination of the Defendant, the prosecutor questioned the Defendant if she had called 9-1-1 to report having seen a disabled veteran being shot, and the defense interposed an objection to the prosecutor's having raised his voice, which the court acknowledged, and to relevance. The court overruled the objection on the basis that the State was allowed leeway during cross-examination and that the question was based upon facts in evidence.

During the State's final argument, the prosecutor said:

> Here, this flight instruction tells you about [the Defendant's] conduct. Remember I asked her. Pretend that she's afraid of her co-conspirators, or co-defendants. Pretend. [Let's] pretend that's accurate. I asked her, when you got up to Ohio did you feel safe? Yes. And at that point, why didn't you call the Memphis Police Department and say Sergeant Byrd, or whoever, or Memphis Police, Memphis Police, I am a witness to the murder of this disabled veteran. Why didn't she? The answer is clear, because she set it up and it went south. Because they planned a robbery and [the Defendant] died.

The defense did not renew its objection to the State's characterization of the victim as a disabled veteran.

Considering, first, the State's waiver argument, the record reflects that the defense did not object to the first neighbor's testimony that the victim received a disabled veteran

payments. Any objection to this evidence was waived, and the evidence was relevant to show that the victim had money on the date of the offenses and was a target for a robbery. *See id.* at 401, 402.

The second neighbor's testimony was the subject of an objection to the witness's providing a "long narrative" that spoke to the victim's character, and the trial court found that the testimony about the victim's having been injured while serving in the military was hearsay. Likewise, during the State's cross-examination of the Defendant, the court overruled the Defendant's objection to the characterization of the victim as a disabled veteran. The court found that the objection was based upon facts in evidence.

The Defendant's appellate argument focuses on the repeated characterization of the victim as a "disabled veteran," which she claims was an attempt to garner sympathy for him. The record reflects that the defense objected during direct examination of the second neighbor, and the trial court sustained the objection. The defense also objected to the State's cross-examination of the Defendant about the victim's being a disabled veteran, which the court overruled. This issue is not waived.

Tennessee Rule of Evidence 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The question before us is whether, despite relevance, the State's characterization of the victim as a disabled veteran was so prejudicial that the evidence as to this fact should have been excluded. The evidence tended to show that the victim had money available and had some limitations that might make him more vulnerable to being overpowered by the Defendant and her codefendants. It was highly relevant to the Defendant's motive in committing the crimes. Because its probative value substantially outweighed the danger of unfair prejudice, the trial court did not abuse its discretion in overruling the defense's objections.

With regard to the State's final argument, we are constrained to note that the Defendant has presented this issue solely as one of evidentiary error in admitting the evidence upon which the prosecutor ultimately relied in its final argument. The State has not raised the issue as one of improper closing argument. *See generally State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). We decline to address an issue that has not been raised and addressed by the parties. *See State v. Bristol*, 654 S.W.3d 917 (Tenn. 2022).

# III

# UNAVAILABLE EVIDENCE

The Defendant contends that the trial court erred in declining to instruct the jury regarding the State's loss of evidence. The Defendant identifies the evidence as (1) an audio recording of codefendant Wilkerson's pretrial interview with police officers and (2) a surveillance video recording from inside a gas station where Wilkerson attempted to use the victim's ATM card. The State responds that the court did not err in declining to give the instruction. We agree with the State.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As a result, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to his guilt or lack thereof or to the potential punishment faced by a defendant. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).

Our supreme court has held that the State has a duty to preserve discoverable evidence when the evidence

> might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Ferguson*, 2 S.W.3d, 912, 917 (Tenn. 2014) (quoting *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)); *see* Tenn. R. Crim. P. 16 (discoverable evidence); *see also State v. Merriman*, 410 S.W.3d 779, 785 (Tenn. 2013). The supreme court has said that the proper inquiry involves, first, determination of whether the State had a duty to preserve the evidence. *Ferguson*, 2 S.W.3d at 917. This duty to preserve applies to "potentially exculpatory" evidence. *Merriman*, 410 S.W.3d at 793 (citing *Ferguson*, 2 S.W.3d at 917). If the State failed to fulfill the duty, three factors must be considered:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

*Id.* The supreme court has said that in evaluating these factors:

> [T]he central objective is to protect the defendant's right to a fundamentally fair trial. If, after considering all the factors, the trial judge concludes that a trial without the missing evidence would not be fundamentally fair, then the trial court may dismiss the charges. Dismissal is, however, but one of the trial judge's options. The trial judge may craft such orders as may be appropriate to protect the defendant's fair trial rights. As an example, the trial judge may determine, under the facts and circumstances of the case, that the defendant's rights would best be protected by a jury instruction.

*Ferguson*, 2 S.W.3d at 917. "[T]he trial court's choice of remedy is subject to review under the abuse of discretion standard." *Merriman*, 410 S.W.3d at 791-92. A trial court's application of the *Ferguson* factors involves a constitutional issue, and our supreme court has concluded that the proper standard of review on appeal concerning the fundamental fairness of a trial is de novo. *Id.* at 791.

The Defendant does not contend that the trial court should have dismissed the charges because a fair trial could not be had in the absence of the evidence. Thus, we confine our analysis to the court's decision not to give the *Ferguson* instruction.

Regarding the purported video recording of Wilkerson's police interview, defense counsel stated at a pretrial hearing that Sergeant West's supplement report stated that she and Sergeant Stark "decided that we would try to get [Wilkerson] on a recording . . . because he said he was not giving any kind of statement on paper. Writer placed a recorder in my pocket and Sergeant Stark and myself returned to the room and asked [Wilkerson] to go back over what happened."

Regarding the recording from inside the gas station, the Defendant argued in a pretrial hearing the absence of this evidence was prejudicial because it was relevant impeachment evidence as to either codefendant Wilkerson's or Detective Byrd's credibility. Defense counsel explained that Wilkerson initially claimed to the police not to have inserted a card into the ATM inside the store because he knew it was stolen but that Wilkerson later testified at his parole hearing that he did not know the card had been stolen and that he inserted the card into the ATM but that it did not work. Counsel said that Wilkerson stated in his written statement that he had not used the card but that counsel expected Wilkerson to contest the accuracy of the statement on this point. Counsel further

- 19 -

explained that Detective Byrd testified at Wilkerson's parole hearing that, on the recording, Wilkerson never inserted a card into the ATM. Counsel said, "I want to be able to impeach [Wilkerson] based on video. [A]lso[,] if Detective Byrd is wrong about what was on that video, then that would be relevant to Detective Byrd's credibility is going to also be critical in this case."

At the pretrial hearing, Sergeant West testified that she had no specific memory of having recorded codefendant Wilkerson's interview. She did not recall if the interview had been recorded. She said that Sergeant Starks had a handheld recorder but that she had none. She said Sergeant Starks transcribed the information from an audio recording or notes to create the written statement that Wilkerson later signed.

Detective Byrd testified at the hearing that video cameras were placed both outside and inside the gas station to which codefendant Wilkerson went with the debit card. Detective Byrd said he viewed a recording which depicted codefendant Wilkerson entering the store and standing in front of the ATM. Detective Byrd said, "Whether or not he puts the card in, I don't believe he did. He stands there in obvious contemplation on whether or not he wants to interact with the machine. . . . He stands there for a while. He never receives anything from the machine. And then he walks out of the store."

Detective Byrd said he obtained the surveillance footage relevant to this case and thought he would have "download[ed] the video to a USB drive." He said his practice was to "download as much of the video as quick as I can." He said he did not like to "impose" on a business in the event the business's assistance were needed again, and he noted that some people do not like to enter businesses when police are present. He said that, when he transferred the recording to his storage device, he "thought . . . everything transferred over." He said that, although footage from outside the store was captured, the recording from the inside of the store was not captured. He said he had not been aware until recently that any portion of the recordings was missing.

The trial court denied the Defendant's motion for the *Ferguson* instruction. With regard to the purported recording of codefendant Wilkerson's interview, the court found that no negligence had been shown in the failure to preserve the evidence. The court found that any probative value of unpreserved evidence was "very slight" and that substitute evidence remained available in the form of Wilkerson's written statement. The court characterized any exculpatory value of potential impeachment evidence as "miniscule" and found that it "would not make any difference at all in the jury's decision." The court did not address the missing gas station interior footage at the pretrial hearing.

At the hearing on the motion for a new trial, the trial court made additional relevant findings:

I find that the two things that were mentioned here, one of them was a statement which no one knows was ever made, a recording of a statement. There's not a question that a statement was made, but the question is was there a recording of it. There's never any showing that there was a recording of it. Therefore, I cannot fault the State for losing something that may not have existed. There's no proof that that statement existed.

Secondly, the -- one of the codefendants went to cash or used the debit card of the victim. There's plenty of evidence to that. There's no question that the person went to use the debit card, and there's nothing this Court can see, there's no evidence that would have been at least -- at the least exculpatory or hurt at all the defendant from any video that might have shown this man standing at the ATM when it was admitted that he did. So I find that that has no impact at all on her having a fair trial.

Although the motion says police did obtain an audio recording of their interview with Travis Wilkerson, that was never proven.

With regard to the purported recording of codefendant Wilkerson's interview, the trial court found that the evidence did not show that such a recording existed. Even if a recording had existed and was consistent with Detective Byrd's recollection of codefendant Wilkerson actions at the ATM, it had little probative value as impeachment evidence, and a written statement signed by codefendant Wilkerson existed. The defense was able to cross-examine Codefendant Wilkerson about multiple points on which he testified inconsistently with his pretrial statement and in his trial testimony. Wilkerson acknowledged that he had numerous prior felony convictions which bore on his credibility. In addition, he acknowledged that he was cooperating with the State with the hope of obtaining a more favorable disposition of his case. Whether he had been truthful about his use of the debit card at the ATM would not have provided any significant impeachment evidence that might have changed the outcome of the trial. The jury had before it the evidence of the Defendant's involvement in the crimes, which included her own testimony of having been present at the victim's apartment and having purchased drugs from codefendant Williams at the house where codefendant Wilkerson was also present. She acknowledged in her testimony that she told Detective Byrd that she may have called codefendant Williams to obtain more drugs before the codefendants arrived at the victim's apartment. The trial court did not abuse its discretion in denying the *Ferguson* instruction for the purported recording of codefendant Wilkerson's interview. *See Merriman*, 410 S.W.3d at 791-92.

- 21 -

With regard to the surveillance footage from inside the gas station, the State had a duty to preserve the evidence. Detective Byrd's failure to capture it when he transferred the data from the gas station's equipment to a USB drive constituted negligence, and the record does not suggest any malicious intent. The value of the unpreserved evidence is insignificant. The defense had abundant impeachment evidence available to attack codefendant Wilkerson's credibility, and any value which could have been gained by impeaching him with the unpreserved recording about whether he inserted the debit card into the ATM was infinitesimal and would have had no effect on the trial, given the evidence of the Defendant's guilt. The trial court did not abuse its discretion in declining to give the *Ferguson* instruction as to this evidence. *Id.*

The Defendant is not entitled to relief on this basis.

## IV

## POLICE RECRUITS IN THE COURTROOM

The Defendant contends that she was denied her constitutional right to a fair trial by the trial court's permitting police recruits to remain in the courtroom over her objection to their presence. The State responds that the Defendant has not shown error in the trial court's ruling. We agree with the State.

On the fourth day of the trial, police recruits sat in the courtroom audience. The Defendant objected to their presence. The trial court overruled the objection, finding that the recruits were members of the public who had a right to be in the courtroom and that observation of court proceedings was required as part of their training. The court thereafter provided the following jury instruction:

> I want to note that we have a bunch of men sitting in the back with ties and white shirts. They have nothing to do with this trial either. They are in a recruiting class for law enforcement and as part of their recruiting class they have to come observe court. And so without my knowing, they showed up today, which is fine. I do this two or three times a year. And so please disregard them because they have nothing to do with this case at all.

As our supreme court has repeatedly recognized, a trial court is afforded "broad discretion in controlling the course and conduct of [a] trial." *State v. Davidson*, 509 S.W.3d 156, 194 (Tenn. 2016); *State v. King*, 40 S.W.3d 442, 449 (Tenn. 2001); *State v. Cazes*, 875 S.W.2d 253, 260 (Tenn. 1994). A basic function of a trial court is to ensure that a criminal defendant receives the fair trial guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and by Article I, section 9 of the Tennessee

Constitution. *Davidson*, 509 S.W.3d at 194. A trial court is generally in the best position to determine how to accomplish this purpose, and absent an abuse of discretion by a trial court in directing the conduct of the trial, an appellate court should not retrospectively second-guess a trial court's decisions made in the midst of a trial. *Id.* (citing *State v. Franklin*, 714 S.W.2d 252, 258 (Tenn. 1986)).

As the Defendant acknowledges, the United States Supreme Court has said that the presence of an increased number of courtroom security officers is not subject to heightened scrutiny. *See Holbrook v. Flynn*, 475 U.S. 560 (1986). The Defendant argues, though, that the presence of uniformed recruits was conspicuous and unnecessary to the proceedings.

A criminal defendant has a right to a public trial. U.S. Const. amend. VI; Tenn. Const. art. 1, § 9; *State v. Sams*, 802 S.W.2d 635 (Tenn. Crim. App. 1990). The right is shared by the defendant and the public, with their "common concern being the assurance of fairness." *Press-Enterprise Co. v. Superior Ct.*, 478 U.S. 1, 7 (1986). Public trials assure transparency in the process, "maintaining public respect for the criminal justice system, ensuring its integrity, and protecting the rights of the accused." *Smith v. Doe*, 538 U.S. 84, 99 (2003); *see State v. Schiefelbein*, 230 S.W.3d 88, 114 (Tenn. Crim. App. 2007). "The right to a public trial is not absolute, however, and in certain cases must yield to other rights or interests." *Schiefelbein*, 230 S.W.3d at 114 (citing *Waller v. Georgia*, 467 U.S. 39, 45 (1984)).

By seeking the exclusion of the recruits, the Defendant sought a partial closure to the public of the trial. *See Sams*, 802 S.W.2d at 639 ("A partial closure results in the exclusion of certain members of the public while other members of the public are permitted to remain in the courtroom."). When a party seeks a partial closure of court proceedings, the following must occur:

[1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced,

[2] the closure must be no broader than necessary to protect that interest,

[3] the trial court must consider reasonable alternatives to closing the proceeding, and

[4] it must make findings adequate to support closure.

*State v. Franklin*, 585 S.W.3d 431, 470 (Tenn. Crim. App. 2019) (citing *Waller*, 467 U.S. at 47).

In the present case, the Defendant has claimed prejudice, but she has failed to articulate how she was denied a fair trial, beyond general allegations of police recruits in the courtroom. Although the Defendant complains about the number of recruits, which she claims in her brief was "a least a dozen" and which she characterizes as "very conspicuous," the trial court found at the motion for new trial hearing that "maybe there were ten or 12 of them" and that they sat on the back row of the gallery. The court found that the recruits had a right to be in the courtroom as members of the public, and it provided an instruction explaining their presence to the jury, thereby instituting a reasonable alternative to closing the proceedings. *See id.* We presume that the jury followed the court's instruction. *See State v. Johnson*, 401 S.W.3d 1, 22 (Tenn. 2013). The Defendant has not shown that the court abused its discretion. She is not entitled to relief on this basis.

## V

## CUMULATIVE ERROR

Finally, the Defendant contends that she should receive a new trial based upon the cumulative effect of the multiple errors she has alleged occurred during the trial. The State responds that no errors occurred and that, therefore, no relief is required. We conclude that the Defendant is not entitled to relief from the cumulative effect of multiple alleged trial errors.

The cumulative error doctrine requires relief when "multiple errors [are] committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted); *see State v. Jordan*, 325 S.W.3d 1, 79 (Tenn. 2010) ("'[T]he combination of multiple errors may necessitate . . . reversal . . . even if individual errors do not require relief.'") (quoting *State v. Cribbs*, 967 S.W.2d 773, 789 (Tenn. 1998)).

In the present case, the Defendant has failed to demonstrate that multiple trial errors occurred. In the absence of multiple errors, cumulative error relief is not available.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

**s/ Robert H. Montgomery, Jr.**
ROBERT H. MONTGOMERY, JR., JUDGE

- 24 -